[Docket No. 27]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

PRIMEPOINT, L.L.C.,

Plaintiff/Counter-claim
Defendant,

    v.

PRIMEPAY, INC.,

Defendant/Counter-claim
Plaintiff.

Civil No. 06-1551 (RMB)

**OPINION**

APPEARANCES:

Adam Gersh, Esq.
Darren Goldstein, Esq.
Yong Jae Kim, Esq.
Flaster Greenberg, P.C.
1810 Chapel Avenue West
Cherry Hill, NJ 08002
        Attorneys for Primepoint, L.L.C.

Philip Burnham, II, Esq.
Burnham & Wiesner, LLC
Plaza 1000 at Main Street
Suite 202
Voorhees, NJ 08043
        Attorneys for PrimePay, Inc.


**BUMB**, United States District Judge:

**Introduction:**

      This matter comes before the Court upon

Plaintiff/Counter-Claim Defendant, Primepoint, L.L.C.'s

(hereinafter "Primepoint"), motion for summary judgment.  For the

1

reasons set forth below, Primepoint's motion will be granted in part and denied in part.

**Factual and Procedural Background:**[1]

Primepoint is a New Jersey company with its principal place of business in Bordentown, New Jersey. Parties' Rule 56.1 Statements at ¶ 3.[2]  Primepoint provides payroll processing and payroll tax services using the "Primepoint" trademark (hereinafter the "Primepoint mark").  Primepoint was founded in 2000 by Alexander and David Bothwell who, at that time, were working in their family's payroll and bookkeeping company, Delaware Valley Payroll.  Id. at ¶ 5.

Primepoint offers payroll processing and payroll tax services via four types of products and services: 1) Full payroll processing, which includes processing payrolls and accounts for payroll taxes for business customers; 2) Branded payroll processing solutions, offered to banks and financial institutions, which allows Primepoint's bank customers to offer branded payroll processing solutions with Primepoint providing all of the payroll processing; 3) Bank product/services marketing - offered by Primepoint to assist banking and financial

---

[1] The facts are drawn primarily from the Parties' Local Rule 56.1 statements and taken in a light most favorable to the non-movant.

[2] Hereinafter collectively referred to as "Parties' SOF."

institution customers to market their products to their own customers; 4) Human Resource Information Services ("HRIS") system, which provides customers with Human Resource information such as OSHA reports and benefits-related information.  Id. at ¶¶ 20-23.

Primepoint's customers are mainly businesses including banks in New York, New Jersey, Pennsylvania and Delaware.  Id. at ¶ 36.  Primepoint utilizes a person to person method of sales and its sales and marketing efforts include payroll presentations to banks and other businesses.  Parties' SOF at 37-38.[3]

Primepoint avers that prior to choosing the name, its team members performed an internet search to determine if that name was in use by any other business and the search revealed no competing uses.  Id. at ¶ 11.  In 2000, Primepoint designed a logo which depicts "Prime" in blue and "point" in green.  Id. at ¶ 16.  The logo includes an "arc-like design element extending to the letter 'i'."  Id.  Later, Primepoint began using the "lead-in" line "powered by Primepoint" to describe its role in the payroll process; this lead-in line is currently used in almost all promotional activities.  Id. at ¶¶ 16-17.  The Primepoint logo is used on a variety of promotional materials and Primepoint

---

[3]  Defendant PrimePay, Inc., avers that Primepoint's services are also marketed through the promotional activities of banks and bank employees who utilize the Primepoint mark (referred to as a "co-branding").

owns and operates an internet website including
www.eprimepoint.com.  Since 2000, Primepoint has spent
approximately $7,000-10,000 per year on marketing, and utilizes a
public relations firm to promote its brand, including targeted
activities to promote its brand to banks.  Id. at ¶¶ 32-34.
Alexander Bothwell testified that in December 2000, Primepoint
approached hundreds of potential investors about a private
placement stock offering and used the "Primepoint" name and logo.
Id. at ¶ 29.  PrimePay alleges that Primepoint's alleged use of
the mark in the context of private placement in December 2000,
was not open and notorious and not directed at the general
public.  Defs.' Counter SOF at ¶¶ 28 & 77.

          On August 7, 2001, Primepoint filed an application to
register the Primepoint trademark with the U.S. Patent and
Trademark Office ("PTO") for "financial services."  Parties' SOF
at 41.  On October 1, 2001, the PTO informed Primepoint that
there were no conflicting marks, but required Primepoint to
revise the rendering of its logo and specify the services it
provides more specifically as "[t]he wording 'financial services'
in the recitation of services is unacceptable as indefinite."
Id. at 42; Pl.'s Ex. 7.  Primepoint revised its drawing and
amended its characterization of services to "Financial Services,
namely banking and payroll services in international class 36."
International class 36 encompasses: 'Insurance; financial

4

affairs; monetary affairs; real estate affairs." Id. at 44.  On February 18, 2003, Primepoint's mark was published for third-party opposition, and none was filed.  The PTO issued registration to Primepoint for its mark in May 13, 2003, (No. 2,715,127). Id. at ¶ 46.  Also, in 2003, Primepoint began using the mark "Primetax" for its payroll tax services and did not seek to register the mark.  The Primetax mark already had been registered to Defendant, PrimePay, Inc., ("PrimePay"). Id. at ¶ 26.

PrimePay provides several services to business owners throughout the U.S. including, but not limited to, the following: 1) Payroll services under the mark "PrimePay"; 2) Tax services under the mark "PrimeTax"; 3) Retirement plan administration and investment services under the mark "PrimePlans"; 4) Flexible benefit plan administration under the mark "PrimeFlex"; and, 5) Workers' compensation insurance under the mark "PrimeComp." Id. at 68.  PrimePay also provides "unemployment cost control services, customer referral and information resources services, COBRA administration services, [and] electronic pay stub services."  Docket No. 29-2, Pellicano Decl. at ¶ 4.  PrimePay's various services are marketed to clients through sales personnel, the internet, referrals from clients, accountants, banks, national affinity programs, and strategic partnerships with software companies.  Parties' SOF at ¶ 71.

PrimePay has offices in Newark, Philadelphia, Baltimore, Washington, D.C., Hartford, Albany, Long Island and Manhattan and can handle payroll and related services in all 50 states.  Pellicano Decl. at ¶¶ 2&4.  "PrimePay primarily serves and targets small to medium sized local businesses including retail banks."  Id. at ¶ 5. PrimePay distributes its services via direct and remote sales, including referrals and its sales methods include face to face presentations, its web site, and distribution of PrimePay memorabilia.  Id. at ¶¶ 11-12.

The "PrimePay" mark has been used since 1995.  The PrimePay mark, when fully stylized in color, includes a gradation from blue to green in which the top of each letter is blue and the bottom is green.  Parties' SOF at ¶67.  PrimePay avers that it spent between $200,000 and $550,000 per year on marketing and advertising using its marks between 1995-2005.  Defs.' Resp. SOF at ¶ 32.  PrimePay has two separate trademark registrations of its "PRIMEPAY" mark: 1) international trademark class 35, which encompasses "advertising, business management, business administration, office functions," and, 2) international trademark class 9, which encompasses, inter alia, electrical and scientific apparatus such as calculating machines, data processing equipment and computers.  While the parties dispute the exact date that Primepoint became aware of PrimePay, the parties agree that there were several instances where Primepoint

6

made presentations to potential customers who were customers of PrimePay.  See id. at ¶¶ 48-51.

On February 10, 2006, PrimePay's counsel sent a cease and desist letter to Alexander Bothwell, Primepoint's CEO, alleging that Primepoint's use of "Primepoint" and "Primetax" infringed on PrimePay's "PrimePay" and "PrimeTax" marks.  Id. at ¶ 55.  In response, Primepoint's counsel contacted PrimePay's counsel and advised that Primepoint would cease using the "Primetax" mark.  Id. at ¶ 57.  PrimePay's counsel then wrote directly to Primepoint (PrimePay avers it had misplaced counsel's name and address) and stated that PrimePay would seek legal remedies if Primepoint did not cease using the Primepoint trademark.  Id. at ¶ 58.

On April 3, 2006, Primepoint filed a Complaint for Declaratory Relief with this Court.  Pursuant to its Complaint, Primepoint asks for declaratory judgment that its use of the mark "Primepoint": 1) does not infringe on the alleged trademark rights of PrimePay under 15 U.S.C. § 1114(1)(a); 2) does not constitute false designation of origin under 15 U.S.C. § 1125(a); and, 3) does not constitute unfair competition under state law. Primepoint's Complaint also asks the Court to declare that equitable estoppel prohibits PrimePay from enforcing its alleged trademark rights.  Id. ¶ 1.

PrimePay filed a counter-claim asking this Court to

7

declare that Primepoint's use of "PRIMEPOINT" and "PRIMETAX" marks infringes on PrimePay's trademarks and that Primepoint's use of these marks infringes on PrimePay's family of marks. Moreover, PrimePay avers that Primepoint's registration of its Primepoint trademark is invalid "because it was procured through fraud on the United States Patent and Trademark Office in that [Primepoint] filed a declaration with the patent and Trademark Office to the effect that [Primepoint] had been engaged in, was engaged in, and intended to be engaged in banking services." [Docket No. 4 at ¶ 85].

On August 15, 2007, Primepoint filed the instant summary judgment motion as to Count I (declaration of non-infringement under the Lanham Act), Count II (declaration of no false designation of origin under the Lanham Act), and Count III (declaration of no unfair competition under state common law). Primepoint is not moving for summary judgment as to Count IV (the declaration of equitable estoppel prohibiting enforcement), because, according to Primepoint, "the claims raised in Count IV will be moot because there will be no infringement."  Pl.'s Br. at 1.  Primepoint also asks this court to dismiss Primepay's counterclaim "unless [PrimePay] can show genuine issues of material fact that would allow it to meets its burden of showing by clear and convincing evidence that Primepoint's mark was fraudulently obtained."  Id. at 4-5.

**Applicable Standard:**

Summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1986).  "In making this determination, a court must make all reasonable inferences in favor of the non-movant."  Oscar Mayer Corp. v. Mincing Trading Corp., 744 F. Supp. 79, 81 (D.N.J. 1990) (citing Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983) cert. dismissed, 465 U.S. 1091 (1984)).  "At the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**DISCUSSION:**

**I.**      **Infringement, Unfair Competition, False Designation of Origin.**

Plaintiff, Primepoint, has moved for summary judgment and argues that its use of the "Primepoint" mark does not infringe on PrimePay's marks, does not falsely designate the origins of its services, and does not constitute unfair competition under either federal or New Jersey law.[4]

---

[4] While the parties' submissions mention the "PrimeTax" mark, it is undisputed that Primepoint has ceased using the

Federal trademark infringement[5] and federal unfair competition/false designation of origin[6] claims are measured by identical standards, as are New Jersey claims for infringement and unfair competition.  <u>A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.</u>, ("A&H V"), 237 F.3d 198, 210 (3d Cir. 2000); see <u>Apollo Distrib. Co., v. Jerry Kurtz Carpet Co.</u>, 696 F. Supp. 140, 143 (D.N.J. 1988) (noting that the analysis of New Jersey law claims for trademark infringement and unfair competition are

_____

PrimeTax mark.  Parties' SOF at ¶ 57.  It is unclear from the parties' papers whether the use of the Primetax mark is at issue here.

[5] Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) which covers trademark infringement, states:
(1) Any person who shall, without the consent of the registrant--
   (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . .shall be liable in a civil action by the registrant. . . .


[6] Section 43(a) of the Lanham Act, 115 U.S.C. 1125(a)(1)(A), which covers false designation of origin/unfair competition, states:
   (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
   (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

the same as the federal analysis).  Trademark infringement is
defined as "use of a mark so similar to that of a prior user as
to be 'likely to cause confusion, or to cause mistake, or to
deceive.'"  Kos Pharms., Inc., v. Andrx Corp., 369 F.3d 700, 711
(3d Cir. 2004) (quoting 15 U.S.C. § 1114(1)).  "To prove either
form of Lanham Act violation, a plaintiff must demonstrate that
(1) it has a valid and legally protectable mark; (2) it owns the
mark; and (3) the defendant's use of the mark to identify goods
or services causes a likelihood of confusion."  A&H V, 237 F.3d
198.

PrimePay has set forth two separate theories of
infringement: 1) that the "Primepoint" mark is likely to be
confused with the "PrimePay" mark individually, and 2) that the
"Primepoint" mark is likely to be confused with PrimePay's family
of marks containing the "Prime" prefix.  Def.'s Br. at 4.  Only
the second theory depends on the establishment of a family of
marks.  Id.

As an initial matter, Primepay argues that "Primepoint
does not assert that it would not infringe on PrimePay's family
should PrimePay establish the existence of a family." Def.'s Br.
at 4.  Accordingly, PrimePay argues that the existence of
PrimePay's family is the only issue regarding this theory of
infringement.  Primepoint's moving brief, however, clearly states
that no family of marks has been established and, also, that

PrimePay cannot demonstrate a likelihood of confusion as to those marks. Pl.'s Br. at 5 (stating that Primepoint "has not infringed on PrimePay's marks because PrimePay has no valid 'family of marks' . . . **and** because PrimePay has failed to demonstrate a likelihood of confusion between Primepoint's and PrimePay's respective marks.") (emphasis added). This Court finds that Primepoint has opposed PrimePay's second theory of infringement on both establishment of a family of marks and likelihood of confusion grounds. Primepoint avers that "irrespective of whether the purported family of marks or simply the PrimePay mark is considered, PrimePay has not shown any evidence, based upon the ten well-settled factors, that there is a likelihood of confusion between the marks." Pl.'s Br. at 1. This Court will first address the family of marks arguments and proceed to the likelihood of confusion analysis, relevant to both theories of infringement.

> a) *Family of Marks*
>
> A "family of marks" is defined as
>
> a group of marks having a recognizable common characteristic, wherein the marks are comprised and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner.

<u>McDonald's Corp. v. Druck & Gerner, DDS., P.C.</u>, 814 F. Supp.

1127, 1131 (N.D.N.Y. 1993) (quoting J & J Snack Foods Corp. v. McDonald's Corp., 932 F.2d 1460, 1462 (Fed. Cir. 1991)). However, "[s]imply using a series of similar marks does not of itself establish the existence of a family.  There must be a recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods." Id. (quoting J & J Snack Foods Corp., 932 F.2d at 1462;  AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 814 (7th Cir. 2002) (stating that a family of marks "exists only if and when 'the purchasing public recognizes that the common characteristic is indicative of a common origin of the goods.'") (quoting Han Beauty, Inc. v. Alberto-Culver Co., 236 F.3d 1333, 1336 (Fed. Cir. 2001)).

          In examining the family of marks issue here, this Court is mindful that "[m]erely adopting and using – and even registering – a group of marks with a common feature does not create a family of marks, even if the user intended to create a family."  AM General Corp., 311 F.3d at 816.  "Whether a family of marks exists is an issue of fact based on the common formative component's distinctiveness, the family's use, advertising, promotion, and inclusion in party's other marks."  Id. at 815; see J & J Snack Foods Corp., 932 F.2d at 1463 (stating that it is "necessary to consider the use, advertisement, and distinctiveness of the marks, including assessment of the

13

contribution of the common feature to the recognition of the marks as of common origin.").[7]   Likelihood of confusion may also enter into the analysis of whether a family of marks exists.   Id.

It is undisputed that at the time Primepoint began using its mark, PrimePay was only using four of its fourteen currently registered marks.  Those four marks are PrimePay, PrimeTax, PrimeFlex, and PrimeLink.  Primepoint avers that in order to survive summary judgment, PrimePay must show that it had established a family of marks at the time Primepoint began using the Primepoint mark.  Primepoint argues that PrimePay cannot show that customers identified the origin of PrimePay's services by the use of the prefix "Prime" and, therefore, cannot show that the public viewed PrimePay's marks as part of a larger family.

In response, PrimePay agues that the common element of its marks, the prefix "Prime" is "inherently distinctive of the payroll processing and associated services it brands" because "Prime" neither describes nor suggests these services.  As such, PrimePay argues that "Prime" is arbitrary or fanciful and should be afforded a higher level of distinctiveness.  Furthermore,

---

[7] By way of example, perhaps one of the most readily identifiable family of marks is the series of "Mc" marks (the formative prefix "Mc" combined with a generic food name) utilized by the McDonald's Corporation. See 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:61 (4th ed. 2007) (discussing well recognized family of "Mc" marks and discussing cases finding that competing marks infringed on that family).

PrimePay asserts that it has "used its suite of marks in a manner designed to create an association of common origin for all marks containing the Prime prefix and has expended significant resources and sales efforts in doing so." Def.'s Br. at 6. Finally, PrimePay avers that "the evidence shows that the common elements of PrimePay's marks as encountered in the marketplace . . . create a recognition of common origin of the common elements."

Despite these conclusory assertions, however, PrimePay has presented this Court with no evidence whatsoever in support of its contention that it has established a family of marks. All this Court knows is that PrimePay has spent between "$200,000 and $550,000 per year on marketing and advertising between 1995-2005" - there is no evidence before this Court as to what type of consumer recognition, if any, has resulted. See EMSL Analytical, Inc., v. Testamerica Analytical Testing Corp., No. 05-5259, 2006 U.S. Dist. LEXIS 16672 at *21-22 (D.N.J. Apr. 4, 2006) (finding that the amount of money spent on advertising and marketing is not necessarily indicative of the strength of a mark especially where there has been no showing that the expenditures resulted in actual consumer recognition of the mark); see also 7- Eleven, Inc. v. Wechsler, 2007 TTAB LEXIS 58 at * 13, 83 U.S.P.Q.2d 1715 (T.T.A.B. 2007) (finding a family of "Gulp" marks exists where there was evidence that the Gulp marks are advertised together

15

and printed publications showed that the public regards the marks as being part of a "Gulp" family).

Without any evidence that PrimePay's mark "has been so extensively advertised that buyers would be likely to think that [Primepoint's] product originates with [PrimePay]," this Court cannot find that PrimePay can survive summary judgment on the family of marks issue. 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 23:61; see Colony Foods, Inc. v. Sagemark, Ltd., 735 F.2d 1336, 1339 (Fed. Cir. 1984) (rejecting a party's argument that the use of the word "HOBO" in several of its marks created a "family", and stating that the party failed to establish, for example, by a survey, that the term HOBO is used in the public in connection with restaurant services to identify the party exclusively.)  On this issue, PrimePay has presented this Court with supposition only; thus, this Court cannot find that an issue of fact exists as to whether PrimePay has a family of marks.[8] 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:61 (4th ed. 2007) (stating that whether a family of marks exists is "a matter of fact, not supposition. The mere fact of registration of many

---

[8] While the parties also dispute the relevant time point for examination of the purported family of marks and mention the likelihood of confusion analysis, this Court need not resolve either issue here because of the dearth of evidence presented by PrimePay as to consumer recognition of a family of marks.

marks with a common syllable does not in itself prove that a family of marks exists in fact.").

### b) Likelihood of Confusion

While this Court finds that there is no issue as to whether a family of marks exists, this Court must still examine whether the "Primepoint" mark is likely to be confused with the individual "PrimePay" mark.[9] "A likelihood of confusion exists when 'consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" A&H V, 237 F.3d at 211 (quoting Dranoff-Perlstein Assocs. v. Sklar, 967 F.2d 852, 862 (3d Cir. 1992)).  In the past, when goods or services did not compete, the court generally applied a ten factor test, developed in Interpace Corp. v. Lapp, Inc., 721 F. 2d 460, 462-63 (3d Cir. 1983), known as the "Lapp factors." Originally, the Third Circuit had held that if the goods compete directly, "a court need rarely look beyond the mark itself" to determine the likelihood of confusion.  However, the Circuit has subsequently held that "the Lapp factors should be used for both competing and non-competing goods."  Freedom Card, 432 F.3d at 471 (citing A&H V, 237 F.3d at 213). In A&H V, 237 F.3d 213-14,

---

[9] Again, it is unclear whether the PrimeTax mark is at issue - while it is mentioned in the parties' papers, the arguments do not expound on the issue.

the Third Circuit made clear that the <u>Lapp</u> factors could be applied regardless of whether the goods or services were competing, especially where "the degree of confusing similarity of the marks is not clear."

The parties contest whether there is any marketplace confusion surrounding the two companies' products, the Primepoint and PrimePay marks, whether some of the services offered by PrimePay are "part of" payroll services, and whether PrimePay targets banks as customers.  Thus, to aid in determining whether there is a likelihood of confusion, this Court will employ the non-exhaustive "<u>Lapp</u> factors."  Pursuant to that analysis, this Court will examine:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
>
> (2) the strength of the owner's mark;
>
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
>
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
>
> (5) the intent of the defendant in adopting the mark;
>
> (6) the evidence of actual confusion;
>
> (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;
>
> (8) the extent to which the targets of the parties' sales efforts are the same;
>
> (9) the relationship of the goods in the minds of

18

consumers because of the similarity of function;

(10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

Freedom Card Inc. v. JP Morgan Chase & Co., 432 F.3d 463, 471 (3d Cir. 2005) (citing Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983)).  Keeping in mind that "none of these factors is determinative of the likelihood of confusion, and [that] each factor must be weighed and balanced on against the other," this Court turns to the individual factors and the facts specific to this dispute.  Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 280 (3d Cir. 2001).[10]

### 1) Similarity of the Marks

"The single most important factor in determining the likelihood of confusion is mark similarity."  A&H V, 237 F.3d at 216.  When testing for similarity the court asks "whether the labels create the same overall impression when viewed separately."  Id. at 216 (internal quotations omitted).  After making this assessment, a court may hold that two marks are confusingly similar "if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship."  Id. at 217. "[T]he proper legal test

---

[10] This Court is also mindful that "the factors are meant to be tools, not hurdles."  A&H V, 237 F.3d at 214.

is not whether there is some confusing similarity between sub-parts of the marks; the overarching question is whether the marks, viewed in their entirety, are confusing similar." <u>Kos Pharmaceuticals</u>, 369 F.3d at 713 (internal quotation omitted). In comparing the Primepoint and PrimePay marks, this Court must closely examine the sight, sound and meaning of both marks.  <u>See A&H V</u>, 237 F.3d at 217.

Primepoint argues the marks appearances are distinct because PrimePay uses "a uniform gradation for each of the letters in PrimePay and its other 'Prime' marks, whereby the top of each letter is blue and the bottom of each letter is green." Pl.'s Br. at 11.  Primepoint argues that its mark is visually different because it uses two distinct colors to separate the letters in "Prime" and in "point" and because PrimePay capitalizes the first and second word of its marks and Primepoint only uses lowercase letters.  Primepoint also points to the visual arc in its mark that leads to the second "i", which does not appear in the PrimePay mark.  Finally, Primepoint believes its mark is distinguishable because of the introductory statement "powered by" that often appears as part of the mark's visual representation.  With regard to sound, Primepoint avers that "point" and "Pay" have no common vowels and "point" ends in a consonant whereas Pay ends in a vowel sound.

Primepoint also seeks to distinguish the marks meaning

20

stating that "Primepoint has no recognized meaning" and was adopted to communicate that the brand is first rate.  Primepoint contrasts PrimePay's mark as "a specific descriptor of the services [PrimePay] offers."   Primepoint also argues that the likelihood of confusion is low because the prefix to both marks, "Prime," is weak.

In response, PrimePay points out that both marks begin with the prefix "Prime" and are followed immediately by a single syllable word beginning with the "identical P phonetic" which results in a "distinctive alliteration that makes the two words very similar to one another." Def.'s Br. at 9.  Moreover, the PrimePay "appears in gradation from blue to green" and the PrimePoint mark has the "Prime" portion in blue and "point" portion in green - creating a mimicking color scheme.  Finally, in the PrimePay mark both words are capitalized, accentuating the fact that the mark is composed of two parts beginning with the letter "P" and in the Primepoint mark the words "Prime" and "point" are in different colors accentuating the words both beginning with the letter P.

Taking all these arguments into consideration and based on this Court's overall impression of the marks at issue as viewed in their entirety, this Court finds that this factor weighs in favor of PrimePay; an issue of fact remains as to whether the marks at issue are sufficiently similar such that

consumer confusion will result.  First, Primepoint and PrimePay have similarities when spoken, such as the prefix Prime and a second alliterative word beginning with the consonant "p." While PrimePay ends in a soft vowel sound and Primepoint a hard consonant sound, both marks are a single "word" consisting of two words spoken together.  This is unlike the marks in A&H V, 237 F.3d at 217, where the Circuit upheld the district court's finding that "The Miracle Bra" and "Miraclesuit" sound different, in part, because Miraclesuit "bleeds two words together while The Miracle Bra consists of three discrete words."  No such distinction exists here.  While the fact that Prime is the prefix to both marks is alone insufficient, overall, when spoken the marks sound similar especially since both consist of a single word made up of two words - the second of which begins with the alliterative "p."  Kos Pharm., Inc., 369 F.3d at 713 ("the proper legal test is not whether there is some confusing similarity between sub-parts of the marks; the overarching question is whether the marks 'viewed in their entirety,' are confusingly similar.").  Moreover both words have the same number of syllables and have the same stress pattern.  See Middleton Inc., v. Swisher Int'l., Inc., 2006 U.S. Dist. LEXIS 51484 at *9 (E.D. Pa. July 17, 2006)(noting syllable and stress pattern similarity).

        Moreover, while the colors are presented in a slightly

22

different manner, both marks use a blue and green color scheme -
Primepoint presents solid blue and then solid green and PrimePay
fades from blue to green from top to bottom of the word.  Another
similarity is that both Primepoint and PrimePay emphasize the
second "word" of the mark - Primepoint by depicting "point" in
another color and PrimePay by capitalizing "Pay."

There are, indeed, some features in the Primepoint mark
that distinguish it somewhat: 1) the visual arc over the
Primepoint mark that extends between the first and second "i" and
2) in all of the renderings of the Primepoint mark supplied by
PrimePay, the tag line "powered by" appears above the Primepoint
mark. Def.'s Exs. A & C.[11]   While these features may be
distinguishing in a side by side comparison of the marks, this
Court is mindful that it must ask a broader question: whether the
marks viewed separately and in their entirety could lead to the
likelihood of confusion.  See Medavante, Inc. v. ProxyMed, Inc.,
2006 U.S. Dist. LEXIS 74614 at *22 (D.N.J. Oct. 12, 2006)("the
fact that there are some differences in what two marks suggest is
not enough to conclude that they are not confusingly similar.")
 Despite any distinguishing characteristics and the fact that the
prefix "Prime" is not particularly strong, as discussed below,

_____

[11] While there are a few renderings of the PrimePoint mark
without the "powered by" line - the majority of the renderings
contain the lead in.  PrimePay admits that currently, "powered
by" "is used in nearly all of Primepoint's promotional
activities."  Parties SOF at ¶ 18.

this Court cannot say that the marks are sufficiently different so that no issue of fact remains as to whether a likelihood of confusion may result; a consumer may be confused as to the source of the product offered.

### *2) Strength of the Marks*

To examine the strength of the mark under <u>Lapp</u>, the Court evaluates "1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and 2) its commercial strength (factual evidence of marketplace recognition)." <u>Freedom Card</u>, 432 F.3d at 472.

i) Distinctiveness or Conceptual Strength

> The conceptual strength of a mark is measured by classifying the mark in one of four categories ranging from the strongest to the weakest: (1) arbitrary or fanciful (such as "KODAK"); (2) suggestive (such as "COPPERTONE"); (3) descriptive (such as "SECURITY CENTER"); and (4) generic (such as "DIET CHOCOLATE FUDGE SODA"). Stronger marks receive greater protection.

<u>Freedom Card</u>, 432 F.3d at 472 (internal quotations and citations omitted). "Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they bear no logical or suggestive relation to the actual characteristics of the goods." <u>A&H V</u>, 237 F.3d at 221 (internal quotation omitted). Suggestive marks "require consumer imagination, thought, or perception to determine what the product is." <u>Id.</u> at 221-22

(internal quotations omitted).  Descriptive terms convey an idea of the "ingredients, qualities or characteristics of the goods." Id. (quotations omitted).  Finally, generic marks constitute the "common descriptive name of a product class." Id. at 222 (quotations omitted).  It is well established that generic marks receive no protection.

Primepoint avers that the PrimePay mark is weak because it is neither arbitrary nor fanciful as the name "PrimePay" incorporates a functional description - i.e., payroll services. Moreover, the there is a great deal of third party use of portions of the mark and there is no evidence of consumer recognition based on PrimePay's expenditures.  In response, PrimePay seeks to categorize its mark as "suggestive because it does not describe the nature of the services."  Additionally, PrimePay argues that the mark is strong because the mark is "synonymous with the business and because PrimePay is a nationally recognized provider of payroll services."  Def.'s Br. at 11.

The PrimePay mark is weak even if this Court agrees with PrimePay's position that the mark is "suggestive."  This Court is hesitant to go as far as to deem the PrimePay mark purely descriptive; while "pay" is a descriptive element, the mark in its entirety - PrimePay- does require some "require consumer imagination, thought or perception to determine what the

25

product is." A&H V, 237 F.3d at 221-222. As such, this Court finds that the PrimePay mark belongs in the suggestive category despite the descriptive element. See id. (finding that "Miraclesuit" was, at best, suggestive). Even if the mark falls into a higher category of protection such as suggestive, "[s]uggestive or arbitrary marks may, in fact be 'weak' marks, particularly if they are used in connection with a number of different products." A&H V, 237 F.3d at 222. Thus, even categorizing PrimePay as "suggestive" does not save the mark from being deemed weak. In this case, Primepoint has presented evidence that as of August 14, 2007, there were more than 240 registered marks using the prefix "Prime" in the financial services industry. Pl.'s Ex. 17. PrimePay does not dispute this evidence and presents no arguments as to why the presence of such marks should not serve to render the PrimePay mark weak. See Citizens Financial Group, 383 F.3d at 124 ("as a general rule, widespread use of even a distinctive mark may weaken the mark."); see also A&H V, 237 F.3d at 223 ("[a]lthough the wide use of a term within the market at issue is more probative than the wide use of a term in other markets, the extensive use of the term in other markets may also have a weakening effect on the strength of the mark."). Moreover, self-laudatory marks such as "Super" or "Plus" are generally held to be weak. A&H V, 237 F.3d at 222. Here, "Prime" can fairly be categorized as a self-laudatory

prefix.

Also, "[i]n examining a mark's commercial strength, we examine marketplace recognition." Freedom Card, 432 F.3d at 472. Other than conclusory statements, PrimePay has presented no documentary or testamentary evidence of its well-established strength in the relevant market. See Urban Outfitters, 511 F. Supp. 2d at 493 (finding mark was strong where a large amount of documentary and testimonial evidence was presented showing the well-established nature of the brand at issue). Merely setting forth the amount of money spent on advertising, while certainly relevant, does not suffice alone here to demonstrate a strong mark and PrimePay has admitted that it has not conducted any surveys to determine whether the PrimePay name is recognized in the target marketplace. Parties SOF at ¶ 72; see EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp., No. 05-5259, 2006 U.S. Dist. LEXIS 16672 at *21-22 (D.N.J. Apr. 4, 2006) (finding that the amount of money spent on advertising and marketing is not necessarily indicating of the strength of a mark especially where there has been no showing that the expenditures resulted in actual consumer recognition of the mark). Because there is no evidence before this Court of consumer recognition, coupled with evidence of widespread use of "Prime" in conjunction with a generic term in the relevant industry, this Court finds that the PrimePay mark is weak and the second Lapp factor weighs

in favor of Primepoint.

### 3) Price of Goods and Care and Attention of Consumers

Generally speaking, the more sophisticated the consumer and the more care and attention that goes into purchasing a product, the less likely confusion will result. "Where the parties' consumers are sophisticated and the purchase process requires close analysis by the buyer, confusion is often unlikely." EMSL Analytical, Inc., 2006 U.S. Dist. LEXIS 16672 at * 24; see Kos Pharm., 369 F.3d at 715 ("[t]he third Lapp factor weights against finding a likelihood of confusion 'when consumers exercise heightened care in evaluating the relevant products before making purchasing decisions.'") (quoting Checkpoint, 269 F.3d at 284). As stated recently by the Third Circuit "[t]he following non-exhaustive considerations should guide a court's determination of the standard of ordinary care for a particular product[:]

> [i]nexpensive goods require consumers to
> exercise less care in their selection than
> expensive ones. The more important the use of
> a product, the more care that must be
> exercised in its selection. In addition, the
> degree of caution used depends on the
> relevant buying class. That is, some buyer
> classes, for example, professional buyers
> will be held to a higher standard of care
> than others. Where the buyer class consists
> of both professional buyers and consumers,
> the standard of care to be exercised by the
> reasonably prudent purchaser will be equal to

28

                      that of the least sophisticated consumer in
the class.

McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 2007 U.S.

App. LEXIS 29751 at * 32-33 (3d Cir. Dec. 24, 2007) (quoting

Versa Prods., 50 F.3d at 204-05) (internal quotation marks,

ellipses, and citation omitted).  However, the mere presence of

"mom and pop" purchasers will not, necessarily require a low

level of sophistication - especially if the products being

purchased constitute an important investment decision for those

purchasers.  See Checkpoint Sys. Inc., 269 F.3d at 286 (finding

that the court properly held that a heightened degree of care

would be used by consumers because of significant investment

required to obtain product at issue).

           It is undisputed that Primepoint and PrimePay's

customers are primarily businesses.  Parties SOF at ¶ 36.

Primepoint avers that the customers at issue are  "sophisticated

executives charged with expanding their bank's offerings and

marketing their bank's services"[12] and that their direct payroll

customers (those with whom Primepoint works with outside of the

confines of a co-branding relationship with a bank), "are

business owners who have a great deal of direct contact with

their payroll provider who do not chose a payroll provider

---

       [12] PrimePay is careful to point out that in a co-branding
and referral relationship the banks, not Primepoint, promote the
services using the Primepoint mark."

spontaneously."  Pl.'s Br. at 17-18.  PrimePay responds by asserting that the target businesses are small and generally unsophisticated and that the end user encountering Primepoint through a bank is "likely to be much more careless and less educated than if the services were encountered through dedicated sales personnel."

This Court finds that this factor also weighs in favor of Primepoint.  It is undisputed that the target customers are businesses, and while PrimePay raises the argument that these businesses lack the sophistication in choosing payroll products, choosing such a service is a business decision requiring a level of sophistication.  While PrimePay may be correct that bank executives are not the ultimate consumer here, a choice of payroll providers does require some thought and deliberation. See Checkpoint, 269 F.3d at 285-86 (a heightened standard of care applicable to purchasers of surveillance equipment and firewall software).  Moreover, other Courts have found that consumers exercise a sophisticated decision making process in relation to products far less complex than payroll services. See A&H V, 237 F.3d at 225 (upholding district court's conclusion that "consumers will be discriminating in their selection of swimwear"); Urban Outfitters, 511 F. Supp. 2d at 494 (finding that high price of clothing items led to conclusion that buyers were "sophisticated").

_5) Intent in Adopting the Mark_

This Court will also examine whether Primepoint either intended to or carelessly adopted a mark that was like an existing mark.  This inquiry "extends beyond asking whether a defendant purposely chose its mark to 'promote confusion'. . . [and also examines] [t]he adequacy and care with which a defendant investigates and evaluated its proposed mark[.]"  Kos. Pharm., 369 F.3d at 720; see  Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc., 511 F. Supp. 2d 482, 501 (E.D. Pa. 2007) ("evidence of a defendant's carelessness in evaluating the potential confusion caused by its mark with that of a senior user is 'highly relevant' and will tend to favor a finding of likelihood of confusion"); but see A&H V, 237 F.3d at 225-26. ("mere intent to copy, without more, is not sufficiently probative of the [] success in causing confusion to weigh such a finding in the [other party's] favor; rather, [an alleged infringer's] intent will indicate a likelihood of confusion only if intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's").

Primepoint avers that it was totally unaware of the PrimePay mark at the time it adopted the Primepoint name.  This argument is supported by the affidavit of Alexander Bothwell who states that when the Primepoint name was considered, his team

31

conducted an internet search to determine if the name was in use, and when no competing uses were found, the name was adopted. Bothwell Affidavit at ¶¶ 7-10.  While PrimePay does not dispute that Primepoint did not intentionally adopt its mark to evoke a connection with PrimePay, it argues that its adoption of the Primepoint and Primetax marks was a reckless or intentional disregard of PrimePay's rights.  More specifically, PrimePay argues that its prominence in the greater Philadelphia area when coupled with the Bothwell's experience in the payroll industry since 1990, points to the incredibility of Primepoint's assertion that it was not familiar with the PrimePay mark.  Again, other than PrimePay's suggestion that Bothwell is not telling the truth, they have presented no evidence to show that Primepoint was careless or reckless - i.e., there is no testimentary or documentary evidence that Primepoint was aware of PrimePay and failed to follow-up that awareness with a proper investigation into pre-existing marks. See Fisons Horticulture, Inc. v. Vigoro Inds., Inc., 30 F.3d 466, 480 (3d Cir. 1994) (stating that the appropriate inquiry is whether the company conducted an adequate name search for other companies marketing similar goods and whether it followed through with an investigation if such companies were found).  Thus, no issue of fact remains regarding carelessness or recklessness.

### 4 & 6)   Length of Time Mark Used Without Confusion and Evidence of Actual Confusion

Because Lapp factors four and six significantly overlap, this Court will address both simultaneously.[13]  "[T]wo parties' concurrent use of 'similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products' allows 'an inference that future consumers will not be confused either.'"  Kos Pharms., Inc., 369 F.3d at 717 (quoting Fisons Horticulture v. Vigoro Indus., 30 F.3d at 476); Versa Prods. Co. v. Bifold Co., 50 F.3d 189, 205 (3d Cir. 1995) ("[i]f a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future.  The longer the challenged product has been in use, the stronger this inference will be.").

Primepoint argues that it has used its mark since 2000 and that six-and-a-half years have passed without any consumer confusion.  PrimePay, however, states that it has significant evidence of actual confusion in the form of events testified to by James Russell, a former PrimePay sales representative for southern New Jersey.  Primepoint believes that the evidence of confusion set forth by PrimePay is both hearsay and de minimus and, therefore, fails to create an issue of material fact.  This

---

[13]   These factors comprise the bulk of the parties arguments to this Court.

Court will first address the hearsay arguments and then Primepoint's averment that any evidence presented is, at best, de minimus and insufficient to create an issue of fact as to whether confusion is likely.

PrimePay seeks to rely on the following testimony as evidence of actual confusion:

1.    Deposition testimony of Mr. Russell stating that, in one incident, a client contacted him after having been contacted by a sales agent for Primepoint  "and asked me about our services because Primepoint had contacted them about their services and was wondering if it was the same company or somebody different and it was kind of confused."  Mr. Russell did not remember the name of the client.  Russell Dep. at 15:21-16:9.

2.    Mr. Russell had an appointment with a potential client and that client called a CPA firm with which PrimePay had a relationship in order to obtain PrimePay's contact info. He testified that "the client did not have my number and wanted to cancel the appointment" when the client contacted the CPA firm "the receptionist at the desk got confused because the company knew that we are PrimePay and she got confused and gave them the Prime[p]oint – the number of the sales rep from Prime[p]oint."  Russell Dep. 18:16-19:4.  When Russell talked to the client, "they said: Aren't you Justin from PrimePay? I said: No, I'm James from PrimePay." Id. at 19:7-9.  Mr. Russell did not remember the name of the client.

3.    Mr. Russell also testified that another CPA firm called him "asking me about a PrimePay client that they needed information for. . . I had gone back to the accounting firm and told her . . . that this is not a PrimePay client, at which time I found out it was a Prime[p]oint client."  Id. at 23: 9-17.  Mr. Russell did not recall how he learned it was a Primepoint client.  Id. at 24:9-11.

4.   Russell also testified that an insurance agent got
the companies confused and thought they were the
same because "he told me that another person at
his company was working with a sales
representative from PrimePay" when, in fact, he
was working with a Primepoint representative. Id.
at 24:20-25:6.  More specifically, Russell
testified that he asked the agent if it was
possible that he was thinking of Primepoint "[a]nd
he said yeah, that might be the name of it, but I
thought it was PrimePay and it – I thought it was
the same company;" Id. at 26:16-18.

Russell also testified that there were other unspecified

instances of confusion.  PrimePay also offers documentary

evidence in the form of an email written by Mr. Russell in 2006,

describing the above listed instances and printouts of Russell's

electronic notebook that purportedly corroborate these instances.

Def.'s Ex. K & L.

As an initial matter, Primepoint objects to much of

Russell's testimony because it does not constitute evidence of

consumer confusion, but rather, confusion on the part of

referring accounting firms.  This Court is aware, however, that

"confusion, mistake, or deception of any kind" is covered "not

merely of purchasers nor simply as to source of origin." Kos

Pharms., 369 F.3d at 711 (internal quotations omitted).

Therefore, the fact that testimony is not all related to alleged

consumer based confusion is not fatal.

Primepoint also argues that the testimony regarding the

incorrect information given to a client by a CPA firm that

resulted in a misdirected call to Primepoint to cancel a PrimePay

35

appointment is rank hearsay subject to no exception.
Furthermore, the call from an accounting firm to PrimePay about a
client of Primepoint is inadmissible as the statement of the
accounting firm employee.  The same objection is raised with
regard to the insurance agent's alleged statements.

PrimePay argues that the statements are not hearsay
because they are not offered for the truth of the matter
asserted.  See Fed. R. Evid. 801(c).  Moreover, to the extent any
statements relayed by Mr. Russell could be deemed hearsay, they
are admissible "under either or both of the then-existing state
of mind exception to hearsay and the present sense impression
exception to hearsay."  See Fed. R. Evid. 803(1) & 803(3)

This Court finds that most of the testimony would be
admissible as non-hearsay based on the record before it.  For
example, statement one is not hearsay because it is being offered
to show a question was asked - not for the truth of the matter
asserted.  A question that asks if the companies are different is
clearly relevant to the issue of confusion.  Part of statement
two is hearsay to the extent that PrimePay seeks to admit
portions of the testimony stating that the receptionist at the
desk got confused because it is a third-party statement offered
for the truth the matter asserted - i.e., the receptionist got
confused.  The portion of the testimony referring to a client
call asking whether Russell was "Justin from PrimePay?" is not

36

hearsay, however, as it is not offered for the truth of the matter but rather to demonstrate that a question was asked.  Mr. Russell's third statement is also admissible as it reflects a question asked.  Finally, portions of Russell's fourth statement contain hearsay - e.g., "he told me that another person at his company was working with a sales representative from PrimePay." See Versa Prods. Inc., 50 F.3d at 212 (finding that testimony by Vice President that "I have been advised by our sales manager in Europe that there was confusion at trade shows, that people had indicated that the valves resembled, were identical and they would lead to confusion" was hearsay).  While Russell's testimony that the agent told him that Primepoint "might be the name of [the company]" qualifies as hearsay - it is likely admissible under the state of mind exception.  See Kos Pharm. Inc., 369 F.3d at 719 (opining that evidence from the certification of Plaintiff's Vice President of Marketing, Aaron Berg, containing statements of doctors that they found the names of two drugs confusion would be admissible as statements of the declarant's then existing state of mind under Fed. R. Evid. 803(3)).[14]

---

[14] In Citizens Financial Group, Inc., 383 F.3d at 132-33 the Court upheld the admission of teller testimony regarding consumer confusion because "the tellers described their personal experiences with customers at the bank, which is not inconsistent with Fed. R. Evid. 801(c)."  Because "the tellers described what they saw and the action they took with respect to customers who appeared to be confused" the court stated that this was not hearsay. Id. at 133.  The court went on to add that "to the extent that any of the customers' statements may be deemed

With regard to the documentary evidence set forth by PrimePay, the decision in <u>Citizens Financial Group, Inc., v. Citizens National Bank of Evans City</u>, 383 F.3d 110 (3d Cir. 2004), is particularly instructive.  In that case, the Circuit found that the district court did not abuse its discretion in requiring evidence of confusion in the form of a "confusion log" prepared by Plaintiff's employees, to exclude entries that reflected the thought process, conclusion or interpretation of the plaintiff's employees who recorded the entries under Fed. R. Evid. 803(1).  Such statements did not qualify under the hearsay exception for present sense impression because "they 'were conclusions based upon information [the recorder] had processed rather than contemporaneous or spontaneous statements that were inherently trustworthy.'"  <u>Citizens Financial Group</u>, 383 F.3d at 122 (citing <u>United States v. Guevara</u>, 277 F.3d 111, 127 (2d Cir. 2001)).

In considering the admissible evidence, this Court is mindful that while certainly relevant, "[e]vidence of actual confusion is not required to prove likelihood of confusion." <u>Checkpoint</u>, 269 F.3d at 291; <u>Versa Products Co., Inc.</u>, 50 F.3d at 205 (same).  To the extent the testimony of Mr. Russell is admissible non-hearsay, the Court is aware that "actual confusion

---

hearsay, we believe [Fed. R. Evid.] 803(3) would apply [to show the declarant's then existing state of mind.]" <u>Id.</u>

evidence collected by employees of a party in a trademark action must be viewed with skepticism because it tends to be biased or self-serving." Citizens Fin. Group, Inc., v. Citizens Nat. Bank of Evans City, 383 F.3d 110, 122 (3d Cir. 2004) (citations omitted).  Some skepticism is applicable here as the sole source of PrimePay's evidence of confusion is a former employee who could not remember specifics regarding the names of the allegedly confused clients.  In addition, as Primepoint argues, the proffered evidence of confusion does not suggest that any confusion was caused by a similarity between Primepoint and PrimePay's marks.  PrimePay does not refute this point.

PrimePay stresses that because evidence of actual confusion is often rare - even a few incidents are highly probative of the likelihood of confusion.  See Kos Pharm, Inc., 369 F.3d at 720.  Moreover, PrimePay argues that the instances related by Mr. Russell are not de minimus because confusion "could easily result in a sale to Primepoint" instead of PrimePay and because confusion among those that refer clients to PrimePay "directly damages PrimePay's business."

PrimePay's arguments are undermined, however, because PrimePay does nothing to provide evidence that any confusion stemmed from the marks at issue.  Secondly, the only source of this evidence is the testimony of a former employee, which for the reasons discussed above is viewed with some skepticism.

39

Moreover, the four instances cited by Russell can fairly be categorized as isolated and idiosyncratic. See A&H V, 237 F.3d at 227 (upholding finding that evidence of actual confusion was isolated and idiosyncratic where a sales agent testified that several professional buyers asked him about a product sold under defendant's mark and that a receptionist received two inquiries regarding the defendant's product). Thus, while "evidence of actual confusion may be highly probative of the likelihood of confusion[,]" Checkpoint Sys., 269 F.3d at 291, a district court can weigh evidence in favor the alleged infringer where evidence of actual confusion is "isolated and idiosyncratic." See McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 366 (3d Cir. 2007) (quoting A&H V, 237 F.3d 227). The nature of the evidence set forth by PrimePay, in conjunction with PrimePay's failure to address the argument that the confusion was not based in any way on the marks at issue, leads this Court to the conclusion that the evidence is isolated, idiosyncratic and de minimus. See Checkpoint, 269 F.3d at 299 (holding that the Circuit held that the District Court did not err in finding that "[g]iven the size of these companies, and the large number of e-mails, customer inquiries, and other communications they receive on a daily basis, these isolated instances of initial interest confusion [over an appreciable period of time] counsel against a finding of likely confusion.").

40

_7, 8, & 9) Channels of Marketing, Trade, and Media_
_Advertising; Overlapping Sales Efforts; Similarity of_
_Function_

The final three factors can be assessed together
because they all deal with the nature of the services provided,
the customers targeted, and the methods use to reach those
customers.  The parties dispute whether the advertising and
marketing efforts, sales efforts and functions of PrimePay and
Primepoint are similar.  If the products are closely related and
the parties sales and marketing efforts overlap, these factors
will weigh in favor of PrimePay.  See Checkpoint, 269 F.3d at
288-89 ("the greater the similarity in advertising and marketing
campaigns, the greater the likelihood of confusion.") (quotation
omitted); Urban Outfitters, 511 F. Supp. 2d 504 ("When the
parties target their sales efforts to the same group of
consumers, there is a greater likelihood of actual confusion
between two marks.").  This is a "fact intensive inquiry that
requires a court to examine the media the parties use in
marketing their products as well as the manner in which the
parties use their sales forces to sell their products to
consumers." Kos Pharms., Inc., 369 F.3d at 722 (internal
quotations omitted).

Primepoint argues that it uses district methods of
marketing services through banking institutions and banking
industry trade groups and PrimePay does not target banks as

41

customers - but, instead, uses them for referrals.  PrimePay
points out that both companies provide identical payroll services
in the same geographic areas.   While Primepoint does engage in
co-branding relationships with banks, end users are invoiced
directly by Primepoint and Primepoint also markets its services
to potential customers directly and targets many non-banking
businesses.

        While there may not be a complete overlap, this factor
weighs in favor of PrimePay, ultimately, both companies offer
payroll services and reach many of the same customers.  See A&H
V, 237 F.3d at 225 (stating that with regard to channels of trade
perfect parallelism will rarely be found).   This conclusion is
well supported in the record as Primepoint's Rule 30(b)(6)
deponent, James A. Jacob, made clear that he became aware of
PrimePay "through a meeting of a prospect who had PrimePay
service their payroll needs."  Jacobs Dep. at 13:5-7.
Mr. Jacob testified that Primepoint replaced PrimePay as payroll
processing server for at least two businesses including New Life
Youth & Family in Pennsylvania.  Thus, it is clear that both
PrimePoint and PrimePay reach similar customers and provide
similar services.

        Primepoint argues that because it principally targets
banks and seeks to offer payroll services that are branded to
individual banks, there is limited overlap with PrimePay's sales

targets - who are business owners.   However, in considering whether the buyers of PrimePay's goods are likely to encounter Primepoint's goods, the Court is mindful that "[g]oods need not be identical for this factor to support a likelihood of confusion." <u>Kos Pharm. Inc.</u>, 369 F.3d at 723,  "[t]he test is whether the goods are similar enough that a customer would assume they were offered by the same source." <u>Checkpoint</u>, 269 F.3d at 286.

Primepoint argues that the parties "operate in distinct sectors of the payroll industry" because it offers branded payroll processing services powered by the Primepoint software, whereas, PrimePay operates "a traditional payroll processing and business services company." Pl.'s Br. at 25.  This, Primepoint says, results in only limited overlap.  As stated above, however, just because there is only a limited overlap, that does not mean that these favors favor Primepoint.  Instead, Primepoint's own witness testified that their business has reached former PrimePay customers to offer the same type of service i.e., payroll processing.  Any distinctions resulting from Primepoint's co-branding relationships with banks constitutes only a part of the business - there are clearly overlaps of customers targeted and services provided as articulated by Primepoint's witness.  Thus, these factors favor PrimePay.

43

_10) Other Factors_

Finally, this Court must examine any other factors suggesting that the consuming public might be confused as to the source of the services offered.  PrimePay argues that the fact that Primepoint, like PrimePay, uses a series of "Prime-based marks" weighs in favor of PrimePay because PrimePay also uses a set of Prime-based marks.  This argument might be more compelling had this Court agreed with PrimePay's argument that it had established a family of marks or had PrimePay shown that its mark is strong and well established among the public.  However, as discussed above, PrimePay has failed to create an issue of fact as to whether it established a family of marks and whether its mark is strong and well-recognized.

Taking all of the Lapp factors into consideration, this Court finds that an issue of fact remains regarding a likelihood of confusion.  The factors weighing in favor of PrimePay relate to the fact that the parties market similar services to some of the same customers and the marks, when viewed in their entirety, may likely cause confusion.  While the remaining prongs favored Primepoint, the issues surrounding mark similarity combined with the overlap in the parties' businesses counsel against a grant of summary judgment.  See A&H V, 237 F.3d at 214 ("when goods are directly competing, both precedent and common sense counsel that the similarity of the marks takes on great prominence."); McNeil

Nutritionals, LLC, 511 F.3d at 367 ("the first Lapp factor is always relevant, and when it favors the plaintiff in a directly competing goods scenario, especially in which the District Court found only the fifth and sixth Lapp factors to favor the defendant outright, the defendant attempting to rebut the likelihood of confusion has a high hurdle to overcome."). Moreover, this Court is mindful that in trademark matters, it should not be hasty to grant summary judgment: "Failure to strictly observe the principles governing summary judgment becomes particularly significant in a trademark or tradename action, where summary judgments are the exception." Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1062-63 (3d Cir. 1991); Middleton Inc. v. Swisher Int'l., Inc., 2006 U.S. Dist. LEXIS 51484 (E.D. Pa. July 17, 2006). Therefore, this Court will deny summary judgment on this point.

## II.        Validity of the "Primepoint" Mark

Also pending before this Court is PrimePay's counter-claim alleging that Primepoint's registration of its "Primepoint" mark is invalid "because it was procured through fraud on the United States Patent and Trademark Office in that [Primepoint] filed a declaration with the patent and Trademark Office to the effect that [Primepoint] had been engaged in, was engaged in, and

45

intended to be engaged in banking services." [Docket No. 4 at ¶ 85].

A party seeking the cancellation of a mark for fraud must show that there was "a willful withholding from the [PTO] by an applicant or registrant of material information or facts, which, if disclosed to the [PTO], would have resulted in the disallowance of the registration sought or to be maintained." La Cena Fine Foods, Ltd. v. Jennifer Fine Foods, No. 01-5746, 2006 WL 2014503 at * 4 (D.N.J. July 18, 2006) (quoting Smith Int'l., v. Olin Corp., 209 U.S.P.Q. 1033, 1043 (T.T.A.B. 1981) (alteration in original). More specifically, a finding of fraud generally requires the following:

> (1) that a false representation of material
> fact existed; (2) that the party had
> knowledge and belief that the representation
> is false; (3) an intention to induce the
> listener to act or refrain from acting in
> reliance upon the misrepresentation; (4)
> reasonable reliance upon the
> misrepresentation; and (5) damage proximately
> resulting from such reliance.

Id. at *5; Dial-A-Mattress Operating Corp., v. Mattress Madness, Inc., 841 F. Supp. 1339, 1353 (E.D.N.Y 1994) (same) (citing 3 McCarthy § 31.21(2)(1), at 31:96). If this claim were to proceed to trial, PrimePay would have to prove fraud on the PTO by clear and convincing evidence. La Cena Fine Foods, Ltd., 2006 WL 2014503 at * 5 (D.N.J. July 18, 2006).

PrimePay, notably citing no case law in support of its

arguments, avers that Primepoint fraudulently misrepresented to the PTO that its mark was used in connection with "banking services."  Primepoint's application for registration of the Primepoint mark, filed in international trademark class 36 – titled "Insurance and Financial; insurance, financial affairs, monetary affairs, real estate affairs" – was originally described in connection with "financial services."  After the PTO examining attorney rejected this recitation of services as "unacceptably indefinite," Primepoint amended the description to include "banking services" and the application proceeded.   PrimePay argues, that it "must have been clear to Primepoint, [that] targeting banks to obtain referrals is not the same as offering banking services."  Def's Br. at 28.

Primepoint, however, contends that summary judgment is warranted because "there is no evidence of fraud by Primepoint." This Court agrees - other than PrimePay's conclusory statements and suppositions, there is no evidence before this Court that Primepoint willfully withheld information in an attempt to induce the PTO to act in reliance.  Because "[t]here is no 'room for speculation, inference or surmise,' and a court must resolve any doubt 'against the charging party,'" La Cena Fine Foods, Ltd., 2006 WL 2014503 at * 4  (quoting Smith Int'l., 209 U.S.P.Q. at 1044), this Court finds that there is no issue of fact sufficient to deny summary judgment in favor of Primepoint on this issue.

47

See id. at *5 (finding that fraud was not established where party seeking cancellation made only "vague conclusory statements attacking the [] marks's validity").[15]

**Conclusion:**

For the aforementioned reasons, this Court finds that Plaintiff/Counter-claim Defendant Primepoint's motion for summary judgment should be denied with regard to likelihood of confusion between the Primepoint and PrimePay marks.  Primepoint is, however, entitled to summary judgment on the family of marks issue.  This Court also finds that summary judgment is warranted as to PrimePay's Counter-claim that the "Primepoint" mark is invalid because of fraud against the PTO.

Dated: <u>February 29, 2008</u>          **s/Renée Marie Bumb**
                                          RENÉE MARIE BUMB
                                          UNITED STATES DISTRICT JUDGE

---

[15] While both parties address the content of PrimePay's descriptions submitted to the PTO, this Court finds that discussion irrelevant to the issue of whether Primepoint perpetrated fraud on the PTO.

48