NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| PRIMEPOINT, L.L.C., |  |
| Plaintiff/Counter-claim Defendant, | Civil No. 06-1551 (RMB) |
| v. |  |
| PRIMEPAY, INC., | **OPINION** |
| Defendant/Counter-claim Plaintiff. |  |

APPEARANCES:

Adam Gersh, Esq.
Darren Goldstein, Esq.
Yong Jae Kim, Esq.
Flaster Greenberg, P.C.
1810 Chapel Avenue West
Cherry Hill, NJ 08002
        Attorneys for Primepoint, L.L.C.

Philip Burnham, II, Esq.
Burnham & Wiesner, LLC
Plaza 1000 at Main Street
Suite 202
Voorhees, NJ 08043
        Attorneys for PrimePay, Inc.


**BUMB**, United States District Judge:

        In this declaratory judgment action, the Court presided over

a bench trial concluding on February 20, 2009.  At issue was

whether the plaintiff, Primepoint, LLC, (the "Plaintiff") is

infringing upon the mark of the defendant, PrimePay, Inc., (the

1

"Defendant") in violation of the Lanham Act, 15 U.S.C. §§ 1051, 1125(a).  Specifically, in light of the Court's prior rulings, the sole issue for resolution at trial was whether the two similar marks were likely to result in confusion in the marketplace.  See Interpace Corp. v. Lapp, Inc., 721 F. 2d 460, 462-63 (3d Cir. 1983) (establishing the ten "Lapp factors" controlling this inquiry).  For the reasons stated herein, the Court finds that there is not a likelihood of confusion, and accordingly enters a judgment for Plaintiff and against Defendant.

## **Procedural Background**

Plaintiff brought this declaratory judgment action in April 2006 in response to Defendant's allegation that the "Primepoint" mark infringed upon its trademarks and Defendant's accompanying demand that Plaintiff stop using the mark.  (Compl. ¶¶ 16-19.) The Complaint sought declarations that Plaintiff has not infringed under the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a) (Compl. ¶¶ 21-31), that Plaintiff has not engaged in unfair competition under state common law (Compl. ¶¶ 32-35), and that Defendant must, for equitable reasons, be estopped from enforcing its trademark, given the five years Plaintiff had used the Primepoint mark without objection from Defendant (Compl. ¶¶ 36-39).  Defendant then brought counterclaims against Plaintiff for trademark infringement under the Lanham Act (Answer ¶¶ 68-78) and

2

New Jersey law (Answer ¶¶ 79-82), as well as for the invalid registration of the Primepoint mark, which, Defendant averred, was procured through fraud (Answer ¶¶ 83-85).

The parties proceeded to conduct discovery.  In August 2007, Plaintiff moved for summary judgment on all counts.  In February 2008, the Court granted-in-part and denied-in-part Plaintiff's motion.  The Court rejected Defendant's first theory of infringement -- namely, that the Primepoint mark is likely to be confused with Defendant's asserted "family of marks" containing the "Prime" prefix -- holding that Defendant had failed to establish such a "family of marks."  (Opp'n 12-17.)  The Court further rejected Defendant's counterclaim alleging that the Primepoint mark is invalid, on the ground that the record was devoid of evidence supporting Defendant's claim that Plaintiff willfully withheld information from the United States Patent and Trademark Office.  (Opp'n 45-48.)  Finally, the Court engaged in a lengthy discussion of whether the Primepoint mark is likely to be confused with the individual PrimePay mark, but, although concluding that most of the applicable factors weighed against a finding of confusion, the Court held that remaining genuine issues of material fact precluded a conclusive determination at the summary judgment phase.  A five-day bench trial followed.

## Findings of Fact

1. Plaintiff, Primepoint, LLC, is a New Jersey limited

3

liability company headquartered at 163 Route 30, Building 1C, Bordentown, NJ 08505.  (Stip. Fcts. ¶ 1.)  It is a regional company, with only two offices: in Bordentown and Turnersville, New Jersey.  (Tr., Feb. 2, 2009, 51:20-21, 85:15-23.)  It provides customers with payroll processing and payroll tax services using the Primepoint mark.  (Stip. Fcts. ¶ 2.) Plaintiff conceives of itself primarily as a technology company that focuses on payroll and human resources information technology.  (Tr., Feb. 2, 2009, 51:12-13.)

2. Defendant, PrimePay, Inc., is a Virginia corporation headquartered at 596 Lancaster Ave., Malvern, PA 19355.  (Stip. Fcts. ¶ 9.)  It is a national company, conducting business in all 50 states, with over 30 offices nationwide, including in Philadelphia, Newark, Hartford, Manhattan, Long Island, Albany, Pittsburgh, Cleveland, Baltimore, and Washington, D.C.  (Stip. Fcts. ¶ 13; Tr., Feb. 6, 2009, 5:9-12.)  It provides payroll processing and other business services to primarily small and mid-sized firms.  (Tr., Feb. 6, 2009, 5:14-6:13.)

3. On August 7, 2001, Plaintiff filed an application to register its Primepoint trademark with the U.S. Patent and Trademark Office.  The U.S. Patent and Trademark Office issued a registration (Registration No. 2,715,127) to Plaintiff for its mark on May 13, 2003.  (Stip. Fcts. ¶¶ 4, 8.)

4. Defendant traces its registration to June 1, 1995, when

4

AutoTax, Inc., the predecessor to PrimePay, filed two applications to register the service mark PrimePay with the U.S. Patent and Trademark Office.  In November 1996, AutoTax, Inc. assigned its rights in the PrimePay mark to Defendant.  (Stip. Fcts. ¶¶ 10-12.)

5. Plaintiff owns and operates the internet website "www.eprimepoint.com"; Defendant owns and operates the internet website "primepay.com".  (Stip. Fcts. ¶¶ 3, 14.)

6. Although Plaintiff and Defendant are both in the business of payroll processing and other human resources services, the two companies operate on distinct business models.  Both companies process payroll and issue paychecks for businesses, among other services.  However, while Defendant views its clients to be the businesses themselves, Plaintiff considers its clients to be intermediary financial institutions like banks, credit unions, and insurance agencies.  Plaintiff's business is focused primarily on "co-branding", that is, developing cooperative relationships with financial institutions like banks, which, in turn, offer Plaintiff's services to their customers.  (Tr., Feb. 2, 2009, 51:24-53:5.)  In other words, Plaintiff conceives of itself as a wholesaler of payroll and related services, while Defendant is a retailer.  (Tr., Feb. 3, 2009, 101:19-21.)

7. Despite their distinct business models, Plaintiff and Defendant are functionally direct competitors.  A substantial

portion of Plaintiff's business is conducted through independent financial institutions.[1]  (Tr., Feb. 2, 2009, 98:13-17; Tr. Feb. 3, 2009, 126:10-17.)  However, Plaintiff, using the Primepoint name, still solicits business from its co-branders' customers (although purportedly acting on behalf of the co-brander).  (Tr., Feb. 2, 2009, 97:4-7; Tr., Feb. 3, 2009, 102:15-18.)  And in doing so, it is trying to take customers or prospective customers away from Defendant.  (Tr., Feb. 3, 2009, 124:11-18.)

Importantly, the remaining portion of Plaintiff's business is conducted through the co-branding entity "Delaware Valley Payroll."  (Tr., Feb. 2, 2009, 97:4-7.)  Although separate corporate entities, Primepoint and Delaware Valley Payroll operate as a single enterprise.  (Tr., Feb. 3, 2009, 125:9-17.)  Delaware Valley Payroll exists only as a separate marketing "brand," so that Primepoint's co-branding partners will perceive their direct competitor to be Delaware Valley Payroll, not Primepoint itself.  (Tr., Feb. 3, 2009, 101:12-102:10.)  The two

---

[1] Precisely what percentage of Plaintiff's business is conducted through these independent financial institutions is a matter of dispute.  One of Plaintiff's witnesses, James J. Jacob, Jr., Primepoint's Vice President of Business Operations, claimed that 70 percent of Plaintiff's business is done through independent financial institutions, while the remaining 30 percent is done through Delaware Valley Payroll, an in-house entity.  (Tr., Feb. 2, 2009, 98:13-17; 125:14-17.)  However, another Plaintiff witness, Alexander Bothwell, Jr., the CEO of Primepoint, claimed that "a good majority" of Plaintiff's customers were engaged through Delaware Valley Payroll, rather than an independent financial institution.  (Tr., Feb. 3, 2009, 126:10-17.)  The Court need not decide which witness is correct.

entities share a common address and phone number. (Tr., Feb. 3, 2009, 130:3-13.)  Delaware Valley Payroll has only four employees, all of whom are also employees of Primepoint. (Tr., Feb. 3, 2009, 98:21-99:9.)  Delaware Valley Payroll has no sales or administrative staff; it relies upon Primepoint's employees to conduct its daily operations and to maintain its customer relationships. (Tr., Feb. 3, 2009, 100:8-11, 143:11-21.)

Regardless of whether Plaintiff's employees are soliciting business on behalf of Delaware Valley Payroll or an independent co-branding entity, they use the Primepoint mark -- on corporate literature, business cards, and other business documents -- and customers perceive them to be selling services on behalf of Primepoint. (Tr., Feb. 3, 2009, 22:3-12; Tr., Feb. 5, 2009, 184:4-18; Tr., Feb. 20, 2009, 56:5-19; Ex. D-35; Ex. D-29; Ex. D-36.)

8. The Primepoint and Primepay marks bear certain similarities:

a. Both marks are composed of an identical prefix ("Prime") and a second short, one-syllable root-word that begins with a P, making the marks alliterative.

b. Both marks are used in commerce without a space between the prefix Prime and the root-word Pay/point.

c. The marks have the same number of syllables and the same stress pattern.

d. Both marks visually signal that they are composed of two parts beginning with the letter "P" -- the PrimePay mark by capitalizing both words; the Primepoint mark by coloring the two component words differently.

e. Both parties use their respective mark as a business name and overarching business brand.  For both parties, the marks are used to designate the specific service that is the core service offered by both parties, payroll processing.

f. Both marks use a blue and green color scheme in connection with the marks.  These color schemes are used throughout the parties' advertisement and promotional efforts including in the parties' promotional literature, websites, presentations, business cards, and other media.

9. The Primepoint and PrimePay marks bear certain differences:

a. Although both marks appear in blue and green, the two marks use different shades of those colors.

b. The blue-green color transition is abrupt in the Primepoint mark, while it is a gradual gradation in the PrimePay mark.  Thus, distinct colors separate the component two words only in the Primepoint mark.

c. While the PrimePay mark visually distinguishes between its prefix and root-word by using a capital-letter "P" to divide them, the Primepay mark uses all lowercase letters.

8

d. The Primepoint mark incorporates a distinctive graphic element: a swooping arc ending at the dot atop the second "i".

e. The root-words "Pay" and "point" are different, sharing no common vowels and ending in different sounds.

f. The root-word "Pay" relates to the paycheck services Defendant provides, while "point" does not.

g. The PrimePay mark is printed in a serif typeface, while the Primepoint mark is not.

h. The Primepoint mark usually includes the phrase "Powered By" to indicate Primepoint's unique role as the technology provider, rather than retailer of business services.

10. Brothers Alexander and David Bothwell founded Primepoint in 2000 while they were working for Delaware Valley Payroll, which was a family-owned payroll and bookkeeping company. (Tr., Feb. 3, 2009, 78:1-14; 79:25-80:20.) The Primepoint name was decided at a late-night brainstorming meeting attended by the two brothers as well as James J. Jacob, Jr., then-sales manager of Delaware Valley Payroll. (Tr., Feb. 3, 2009, 80:5-81:11.) They chose the prefix "prime" because of its generally positive connotation and its connection to financial services; they chose "point" because it reflected the array of services, revolving around a central point, that the new business would provide. (Id. at 82:4-22; 108:15-110:8.)

11. The Bothwells conducted an internet search to ensure
that the name was not already in use.  (Id. at 82:19-83:6.)  That
search did not inform them of the existence of PrimePay.  (Id.)
They then engaged an attorney to ensure that their use of the
name was in compliance with legal requirements, including proper
registration.  (Id. at 82:20-22, 88:6-12.)  Despite their
collective experience in the payroll processing industry, they
had not heard of PrimePay at the time they selected the name.
(Id. at 110:6-8.)

12. Plaintiff markets its product in a variety of ways.  It
meets with representatives from financial institutions such as
banks and insurance agencies -- potential co-branders -- to sell
its product through the previously described "wholesale" model.
(Tr., Feb. 2, 2009, 81:3-22.)  It also meets directly with "end-
users," that is, the businesses ultimately purchasing the payroll
and business services, through these co-banding partners.  (Id.
at 82:7-12.)  Often -- but not always -- a representative from
the co-branding partner is present at these meetings.  (Id.; Tr.
Feb. 3, 2009, 137:20-23.)  It also markets directly to end-users,
purportedly through the vehicle of Delaware Valley Payroll;
however, only Primepoint representatives are present at these
meetings and the representatives distribute Primepoint
promotional materials, business cards, etc.  (Tr., Feb. 2, 2009,
at 85:1-8, 93:8-11, 126:16-20.)  Plaintiff also promotes itself

by attending trade events like chamber of commerce meetings, initiating contact with public accountants, responding to referrals and inquiries, distributing promotional literature through in-person contact and direct mail, making in-person sales calls, and, at least sometimes, conducting "cold calls" directly to end-user businesses.  (Id. at 115:11-116:14, 105:2-3; Tr., Feb. 3, 2009, 114:4-5.)  In total, Plaintiff spends approximately $30,000 annually on its advertising and promotional activities. (Tr., Feb. 3, 2009, 114:16-17.)

13. Defendant employs many of the same marketing techniques, including: in person sales presentations, cold calling by telephone and in person, networking with referral sources including public accountants, insurance brokers, bankers, and other business service providers, attending chambers of commerce events, trade shows, and other business-to-business events, and distributing promotional literature.  (Tr., Feb. 20, 2009, 121:20-22, 123:18-23; Exs. D-1-9.)  Defendant spends between $500,000 and $1,000,000 annually on advertising and promotional activities.  (Tr., Feb. 6, 2009, 9:4-7.)

14. For both parties, a primary channel of delivery of their services is the internet and the proprietary software that each company creates.  (Tr., Feb. 2, 2009, 53:9-64:25; Tr., Feb. 20, 2009, 70:12-24, 71:18-73:7, 80:20-81:1.)

15. Plaintiff did not become aware of Defendant until 2004.

11

(Tr., Feb. 2, 2009, 92:9-93:24.)  Plaintiff has not encountered
any instances of confusion between the two companies.  (Tr., Feb.
2, 2009, 100:10-12; Tr., Feb. 3, 2009, 83:8-11, 117:15-22.)

16. Defendant has encountered sporadic instances of consumer
confusion.  (Tr., Feb. 5, 2009, 12:20-25, 25:7-17, 29:7-21,
56:16-20, 67:8-71:21, 82:4-16, 184:25-186:16; Tr., Feb 20, 2009,
56:1-11.)  One PrimePay sales representative testified to making
approximately 100,000 contacts in New Jersey in his two years
working at the company, and encountering only one instance of
confusion.  (Tr., Feb. 5, 2009, 56:16-20.)  Another PrimePay
sales representative testified to making approximately 3,000
telephone contacts in her one year working at PrimePay, and
encountering only two instances of confusion.  (Tr., Feb. 5,
2009, 188:7-25.)

17. The word "Prime" within the names of businesses that
deal generally in monetary and financial matters is common.  (Ex.
P-25.)

### Conclusions of Law

1. Federal trademark infringement and federal unfair
competition/false designation of origin claims are measured by
identical standards, as are New Jersey claims for infringement
and unfair competition.  A&H Sportswear, Inc. v. Victoria's
Secret Stores, Inc., ("A&H V"), 237 F.3d 198, 210 (3d Cir. 2000);
see Apollo Distrib. Co., v. Jerry Kurtz Carpet Co., 696 F. Supp.

12

140, 143 (D.N.J. 1988) (noting that the analysis of New Jersey law claims for trademark infringement and unfair competition are the same as the federal analysis).

2. Section 32(1) of the Lanham Act, which covers trademark infringement, states:

> (1) Any person who shall, without the consent of the registrant--
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . . shall be liable in a civil action by the registrant . . . .

15 U.S.C. § 1114(1).  Section 43(a) of the Lanham Act, which covers false designation of origin/unfair competition, states:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

115 U.S.C. 1125(a)(1)(A).

3. Trademark infringement is defined as "use of a mark so similar to that of a prior user as to be 'likely to cause confusion, or to cause mistake, or to deceive.'" <u>Kos Pharms., Inc., v. Andrx Corp.</u>, 369 F.3d 700, 711 (3d Cir. 2004) (quoting

15 U.S.C. § 1114(1)).  "To prove either form of Lanham Act
violation, a plaintiff must demonstrate that (1) it has a valid
and legally protectable mark; (2) it owns the mark; and (3) the
defendant's use of the mark to identify goods or services causes
a likelihood of confusion."  A&H V, 237 F.3d 198.  Only the third
element -- the likelihood of confusion -- is in dispute here.

    4. "A likelihood of confusion exists when 'consumers viewing
the mark would probably assume that the product or service it
represents is associated with the source of a different product
or service identified by a similar mark.'"  A&H V, 237 F.3d at
211 (quoting Dranoff-Perlstein Assocs. v. Sklar, 967 F.2d 852,
862 (3d Cir. 1992)).  Likelihood of confusion can be determined
with reference to a ten-factor test, developed in Interpace Corp.
v. Lapp, Inc., 721 F. 2d 460, 462-63 (3d Cir. 1983), which has
come to be known as the "Lapp factors."  Freedom Card, 432 F.3d
at 471 ("[T]he Lapp factors should be used for both competing and
non-competing goods." (citing A&H V, 237 F.3d at 213)).  The Lapp
factors are:

> (1)  the degree of similarity between the owner's mark
>      and the alleged infringing mark;
>
> (2)  the strength of the owner's mark;
>
> (3)  the price of the goods and other factors indicative
>      of the care and attention expected of consumers
>      when making a purchase;
>
> (4)  the length of time the defendant has used the mark
>      without evidence of actual confusion arising;

14

(5)  the intent of the defendant in adopting the mark;

(6)  the evidence of actual confusion;

(7)  whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8)  the extent to which the targets of the parties' sales efforts are the same;

(9)  the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

Freedom Card Inc. v. JP Morgan Chase & Co., 432 F.3d 463, 471 (3d Cir. 2005) (citing Lapp, 721 F.2d at 463).  "[N]one of these factors is determinative of the likelihood of confusion, and each factor must be weighed and balanced against the other." Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 280 (3d Cir. 2001).

    5. The first Lapp factor, similarity of the marks, favors neither Plaintiff nor Defendant.

        a. When testing for similarity, courts ask "whether the labels create the same overall impression when viewed separately."  Id. at 216 (internal quotations omitted).  Two marks will be considered confusingly similar "if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship."  Id. at 217.  Courts view the marks in their entirety.  Kos Pharm., 369

F.3d at 713.

b. The two marks at issue here bear certain similarities:  they begin with the prefix "Prime"; the prefix is followed immediately by a single syllable word beginning with "P", which results in alliteration between the two words; the marks incorporate the colors blue and green; both marks signal that the they are composed of two parts beginning with the letter "P" (the PrimePay mark by capitalizing both words, the Primepoint mark by coloring the two component words differently).

c. The two marks bear certain differences:  the blue-green color transition is abrupt in the Primepoint mark, while it is a gradual gradation in the PrimePay mark (Tr., Feb. 6, 2009, 22:4-18);[2] distinct colors separate the component two words in the Primepoint mark; the latter "P" is capitalized in the PrimePay mark; the Primepoint mark incorporates a distinctive graphic element, a swooping arc ending at the dot atop the second "i"; the PrimePay mark is printed in a serif typeface, while the Primepoint mark is not (Tr., Feb. 20, 2009, 30:22-31:1); the Primepoint mark is usually accompanied by the introductory words "Powered By"; the marks incorporate distinctive sounds ("point"

---

[2] At trial, Plaintiff elicited testimony on cross-examination that the precise shades of blue and green in the two marks are different.  (Tr., Feb. 20, 2009, 33:10-34:5).  While this is undoubtedly correct, consumers in the marketplace would not be sensitive to this subtle difference unless they were comparing the two marks alongside one another.

and "Pay" have no common vowels and "point" ends in a consonant whereas Pay ends in a vowel); and the word "Pay" relates to the paycheck services Defendant provides (Tr., Feb. 6, 2009, 19:13-15), while "point" does not.

d. In its summary judgment Opinion, the Court noted that the facts as then presented weighed in favor of a finding of likely confusion between the marks.  (Op. 23-24.)  The Court relied heavily upon the fact that both marks are composed of the same number words (two), the same number of syllables (two), and have the same stress pattern.  See A&H V, 237 F.3d at 217 (distinguishing the marks in part because one "bleeds two words together while [the other] consists of three discrete words"); Middleton, Inc. v. Swisher Intern'l, Inc., No. 03-3908, 2006 WL 2129209, *3 (E.D. Pa. July 26, 2006) (noting syllable and stress pattern similarity).  However, the Court added that, "an issue of fact remains as to whether the marks at issue are sufficiently similar such that consumer confusion will result."  (Op. 23-24.) See Medavante, Inc. v. ProxyMed, Inc., 2006 U.S. Dist. LEXIS 74614 at *22 (D.N.J. Oct. 12, 2006) ("[T]he fact that there are some differences in what two marks suggest is not enough to conclude that they are not confusingly similar.").

e. Having heard all of the evidence at trial and having reviewed the marks in their context -- on websites, brochures, signs, banners, mugs, book-covers, letterhead, sales literature,

17

water bottles, pens, baseball caps, mouse-pads, and golf towels -
- the Court finds that the marks' similarity weighs neither in
favor, nor against, an ultimate finding of a likelihood of
confusion.  The marks bear substantial similarities, to be sure.
The Court is mindful that similar characteristics weigh more
heavily than isolated differences.  <u>Middleton</u>, 2006 WL 2129209,
*3 (citing <u>Official Airline Guides, Inc. v. Goss</u>, 6 F.3d 1385,
1392 (9th Cir. 1993)).  The Court is nonetheless struck by the
noticeably different overall "look and feel" of the two marks,
despite their similarities.[3]  The PrimePay mark appears in a
typewriter-like typeface, which conveys the mood and tone of
business.  The Primepoint mark appears in a more casual and
modern sans-serif typeface, accompanied by the swooping graphic
element, which conveys a markedly different mood and tone.  The
similar coloring of the two marks does not mitigate this tonal
difference, since the relevant colors -- blue and green -- are
popular and thus undistinguished.  (Tr., Feb. 20. 2009, 38:3-24.)
While the Court recognizes that some consumers may be confused by
the similar-sounding names, the Court cannot with confidence

_____

[3] Defense witness Todd Quarfot aptly described what is meant
by a mark's "look and feel":  "A look and feel is an image that
we want to portray so that when a prospect[ive client] or anyone
else views it, they kind of see it as part of a similar family,
[as] part of a line of products and services.  So, when they see
it they signify PrimePay. . . . It's part of, you know, our
strategy to help build our brand and give consistency when people
see PrimePay documentation, they signify that with a PrimePay
product or service."  (Tr., Feb. 6, 2009, 31:21-32:13.)

conclude that such confusion, in the context of their different appearance, is likely or common.[4]

6. The second Lapp factor, strength of the mark, weighs in favor of Plaintiff.

a. To examine the strength of the mark under Lapp, the Court evaluates "1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and 2) its commercial strength (factual evidence of marketplace recognition)." Freedom Card, 432 F.3d at 472.

> The conceptual strength of a mark is measured by classifying the mark in one of four categories ranging from the strongest to the weakest: (1) arbitrary or fanciful (such as "KODAK"); (2) suggestive (such as "COPPERTONE"); (3) descriptive (such as "SECURITY CENTER"); and (4) generic (such as "DIET CHOCOLATE FUDGE

---

[4] The Court holds that the first Lapp factor does not weigh clearly in favor of either party.  In other words, the Court lacks a sufficient basis to conclude either that the mark's similarities make marketplace confusion likely or unlikely. Perplexingly, the parties did not offer any evidence (such as expert testimony) about what characteristics are most salient in the eyes of a typical consumer or what characteristics are most likely to cause confusion.  Faced with two marks that are similar in some respects and different in other respects, the Court has little basis to decide "if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship." Checkpoint Sys., 269 F.3d a 217.  To illustrate the point:  Plaintiff's papers assert that the two marks sound sufficiently different that they "are unlikely to be misheard for one another," (Pl.'s Br. 16, ¶ 77), while Defendant's papers make precisely the opposite claim, (Def.'s Br. 6, ¶ 4).  The Court lacks any basis whatsoever to determine which averment is correct.  Furthermore, as the Court will discuss, the anecdotal evidence that a few customers have been confused in the past due to the marks' similarity certainly cannot support a finding that such confusion is likely as a general matter.

SODA").  Stronger marks receive greater protection.
Freedom Card, 432 F.3d at 472 (internal quotations and citations
omitted).

        b. In its summary judgment Opinion, the Court held that
the PrimePay mark is weak, despite being in the "suggestive"
category.  See A&H V, 237 F.3d at 222 ("Suggestive or arbitrary
marks may, in fact be 'weak' marks, particularly if they are used
in connection with a number of different products.").  Although
"pay" is a descriptive element, the mark in its entirety
"require[s] consumer imagination, thought or perception to
determine what the product is."  A&H V, 237 F.3d at 221-222.  The
Court relied upon three factors in reaching its determination:
widespread use in the industry, see Citizens Financial Group, 383
F.3d at 124 ("[A]s a general rule, widespread use of even a
distinctive mark may weaken the mark."), the mark's self-
laudatory character, see A&H V, 237 F.3d at 222 (nothing that
marks such as "Super" or "Plus" are generally held to be weak),
and little market recognition, see Urban Outfitters, 511 F. Supp.
2d at 493 (finding strong mark where brand was well-established
and widely recognized).

        c. No evidence offered at trial undermines the Court's
prior view.  The only evidence offered by Defendant suggesting
the PrimePay mark's strength is evidence of its advertising
expenditures, amounting to between $500,000 and $1,000,000

20

annually, (Tr., Feb. 6, 2009, 9:4-7), as well as the appearance
of the PrimePay mark on all checks Defendant processes and
promotional materials it distributes.  (Tr., Feb. 5, 2009,
14:16-15:9, 16:11-22, 20:14-21:9, 21:21-24, 22:4-23:23; Feb. 6,
2009, 16:1-16, 37:9-38:4.)  The Court is unswayed by this
evidence.  While relevant, this evidence does not suffice to
establish a strong mark.  See EMSL Analytical, Inc. v.
Testamerica Analytical Testing Corp., No. 05-5259, 2006 U.S.
Dist. LEXIS 16672, *21-22 (D.N.J. Apr. 4, 2006) (finding that the
amount of money spent on advertising and marketing is not
necessarily indicative of the strength of a mark especially where
there has been no showing that the expenditures resulted in
actual consumer recognition of the mark).  Defendant has not
conducted a survey or focus group to determine how recognizable
the PrimePay name is in the marketplace.  (Tr., Feb. 20, 2009,
42:11-43:9.)  In contrast, Plaintiff has presented some evidence
that the word "prime" is a frequent element in the marks of
correlative businesses.  (Tr., Feb. 3, 2009, 160:3-12; Ex. P-
25.)[5]  Accordingly, the evidence offered at trial confirmed the

_____

[5] The parties spent considerable time at trial disputing
whether the trademark search conducted by Plaintiff's witness,
Jordan LaVine, was of the proper industry class.  The Court found
this dispute to be of limited value.  The search conducted by Mr.
LaVine was probative insofar as it illustrated generally that the
word "prime" is a common element among similar businesses (that
is, businesses dealing in monetary and financial matters).
Whether a search in International Class 35, rather than Class 36,
would have provided a somewhat more precise measure of the

Court's previously stated view that the PrimePay mark is weak.

7. The third <u>Lapp</u> factor, attention of consumers, weighs in favor of Plaintiff.

a. "Where the parties' consumers are sophisticated and the purchase process requires close analysis by the buyer, confusion is often unlikely." <u>EMSL Analytical</u>, 2006 U.S. Dist. LEXIS 16672, * 24; <u>see also</u> <u>Kos Pharm.</u>, 369 F.3d at 715 ("The third Lapp factor weights against finding a likelihood of confusion 'when consumers exercise heightened care in evaluating the relevant products before making purchasing decisions.'") (quoting <u>Checkpoint</u>, 269 F.3d at 284).  When the consumer is a "professional buyer", in particular, it is assumed that the consumer exercises a higher standard of care than others.  <u>McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC</u>, 2007 U.S. App. LEXIS 29751, * 32-33 (3d Cir. Dec. 24, 2007) (quoting <u>Versa Prods.</u>, 50 F.3d at 204-05) (internal citation omitted).  Notably, the mere presence of "mom and pop" purchasers will not require a low-level of sophistication -- especially if the products being purchased constitute an important investment decision for those purchasers.  <u>See</u> <u>Checkpoint Sys. Inc.</u>, 269 F.3d at 286 (finding

---

frequency of "prime" is irrelevant to the general, and undisputed, notion that "prime" is common among such businesses. Furthermore, since Defendant did not introduce the results of a search in its preferred Class, the Court lacks any reason to believe that the results in that Class would be substantially different.

that the court properly held that a heightened degree of care would be used by consumers because of significant investment required to obtain product at issue).

b. In its summary judgment Opinion, the Court held that this factor weighed in favor of Plaintiff because both company's customers are primarily businesses, which are expected to take care in selecting a payroll service provider.  The Court noted that even relatively unsophisticated businesspeople will normally select a human-resources service provider with special care.

c. The evidence presented at trial confirmed that businesses contracting with payroll service providers exercise care in doing so.  The consumer decision is not casual, unmindful, or spontaneous; representatives of both companies routinely meet with prospective clients for extended periods to pitch their product, (Tr., Feb. 2, 2009, 81:25-82:2; Tr., Feb. 5, 2009, 79:23-80:2), the decision is often approved by more than one decision-maker in the client-company (Tr., Feb. 5, 2009, 180:11-24; Tr., Feb. 20, 2009, 54:10-20), and the client-companies often make the decision after having experience with other payroll services companies (Tr., Feb. 5, 2009, 179:2-3, 194:3-4; Tr. Feb. 20, 2009, 52:14-18).

d. The Court does not rely upon the distinction drawn by Plaintiff that its clients are "co-branders" -- banks and other financial institutions -- not the ultimate purchasers of

payroll services.  The Court heard testimony that Delaware Valley Payroll may sometimes do business under the Primepoint name (Tr., Feb. 5, 2009, 181:6-7, 184:4-18; Tr., Feb. 20, 2009, 56:5-21), and thus proceeds on the assumption that customers are deciding between services provided by Primepoint and PrimePay. Nonetheless, given the customers' sophistication and the decision's importance, the Court finds that customers make the purchasing decision with heightened attention and care.

8. The fifth Lapp factor, Plaintiff's intent in adopting the mark, weighs in favor of Plaintiff.

a. The relevant inquiry "extends beyond asking whether a defendant purposely chose its mark to 'promote confusion'. . . [and also examines] [t]he adequacy and care with which a defendant investigates and evaluates its proposed mark . . . ." Kos. Pharm., 369 F.3d at 720; see Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc., 511 F. Supp. 2d 482, 501 (E.D. Pa. 2007) ("evidence of a defendant's carelessness in evaluating the potential confusion caused by its mark with that of a senior user is 'highly relevant' and will tend to favor a finding of likelihood of confusion").  But see A&H V, 237 F.3d at 225-26 ("[An alleged infringer's] intent will indicate a likelihood of confusion only if intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's.").

24

b. In its summary judgment Opinion, the Court found that "no issue of fact remains" as to Plaintiff's care in adopting the Primepoint mark, because there was no record evidence that Primepoint was aware of PrimePay and failed to follow-up on that awareness with a proper investigation into pre-existing marks. (Op. 32.)

c. Although Defendant now urges the Court to abandon its summary judgment ruling as to this issue, it has persisted in failing to present evidence that Primepoint was aware of PrimePay and failed to follow-up on that awareness with a proper investigation. Indeed, the only relevant evidence presented at trial is that: (i) despite Plaintiff's substantial experience conducting payroll-related business in the region, it had not heard of PrimePay (Tr., Feb. 3, 2009, 83:8-14); (ii) Plaintiff conducted an internet search to confirm that no other companies were using the Primepoint name (Tr., Feb. 3, 2009, 81:5-11); and (iii) Plaintiff engaged legal representation to ensure legal compliance and register the mark (Tr., Feb. 3, 2009, 88:6-12). On this evidence, the Court cannot conclude that Plaintiff was reckless in its selection of the Primepoint mark. See Fisons Horticulture, Inc. v. Vigoro Inds., Inc., 30 F.3d 466, 480 (3d Cir. 1994) (stating that the appropriate inquiry is whether the company conducted an adequate name search for other companies marketing similar goods and whether it followed through with an

25

investigation if such companies were found).

9. The fourth and sixth Lapp factors, which the Court will address together, weigh in favor of Plaintiff.  Those closely related factors are: the length of time Plaintiff has used the mark without evidence of actual confusion arising and the evidence of actual confusion itself.

a. "[T]wo parties' concurrent use of 'similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products' allows 'an inference that future consumers will not be confused either.'"  Kos Pharms., Inc., 369 F.3d at 717 (quoting Fisons Horticulture v. Vigoro Indus., 30 F.3d at 476); Versa Prods. Co. v. Bifold Co., 50 F.3d 189, 205 (3d Cir. 1995) ("If a defendant' product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future.  The longer the challenged product has been in use, the stronger this inference will be.").

b. In its summary judgment Opinion, after an extensive discussion of the hearsay issues implicated by the record evidence, the Court held that the evidence of confusion presented by Defendant was "isolated, idiosyncratic and de minimus" and was thus insufficient to weigh in Defendant's favor.  (Op. 40.)

c. The Court recognizes that any evidence of actual

26

confusion should not be minimized.  J. Thomas McCarthy, 4
McCarthy on Trademarks and Unfair Competition, § 23:13 (2009)
("Any evidence of actual confusion is strong proof of the fact of
a likelihood of confusion.").  Indeed, "it is difficult to find
evidence of actual confusion because many instances are
unreported.  For this reason, evidence of actual confusion may be
highly probative of the likelihood of confusion." Checkpoint
Systems, 269 F.3d at 291.  However, isolated instances of
confusion do not necessarily establish a likelihood of confusion.
McCarthy, supra, at §23:14 ("[A]n isolated instance of confusion
does not prove probable confusion.  To the contrary, the law has
long demanded a showing that the allegedly infringing conduct
carries with it a likelihood of confounding an appreciable number
of reasonably prudent purchasers exercising ordinary care."
(quoting Int'l Ass'n of Machinists & Aero. Workers v. Winship
Green Nursing Ctr., 103 F.3d 196 (1st Cir. 1996).)  In
particular, if isolated instances of confusion arise in the
context of a large volume of contacts, these instances should be
accorded relatively little weight.  McCarthy, supra, § 23:14
(citing, inter alia, A&H Sportswear, 237 F.3d at 198 ("Placed
against the background of the number of opportunities for
confusion, it is not so surprising that isolated evidence of
actual confusion exists.  However, such evidence is not itself
sufficient to establish a likelihood of confusion.")).

27

d. Here, Defendant offered five witnesses testifying to an experience of customer confusion.[6]  Three of the witnesses were current or former PrimePay employees who encountered sporadic instances of confusion in their contact with prospective customers;[7] the remaining two witness were PrimePay customers who corroborated the testimony of the employee-witnesses by testifying to being confused themselves.[8]  The Court is mindful of the highly persuasive force normally accorded to testimony of actual confusion.  However, two factors mitigate the impact of

---

[6] As to accounts of customer confusion presented at trial, Plaintiff objected numerous times to questions and testimony on grounds of hearsay.  The Court ruled on some of these objections and reserved ruling on others.  The Court has reviewed all of the statements about which objections were raised and has adhered to the hearsay standards set out in its summary judgment Opinion.  In short, statements evincing confusion, especially statements that stand for factually incorrect propositions, are not hearsay because they are not offered for the truth of the matter asserted.

[7] The Court is unsure what weight to give the instances of confusion presented by the PrimePay employee-witnesses, since the purportedly confused party -- the clients or prospective clients -- did not testify and were not subject to cross-examination.  "Sometimes what appears at first glance to be evidence of confusion is merely evidence of consumer error not related to name confusion."  McCarthy, supra, § 23:13.  The Court has no way to determine which of these instances were genuine confusion and which ones were, in fact, consumer error that the witnesses wrongly perceived as confusion.  For example, it is quite likely that at least one instance of purported confusion was actually mere error.  (Tr., Feb. 5, 2009, 29:14-21.)

[8] Each of Defendant's witnesses had an incentive to embellish their testimony, as they were all current or former PrimePay employees, or being compensated by PrimePay for their testimony.  (Tr., Feb. 5, 2009, 196:23-198:1; Tr. Feb. 20, 2009, 57:4-5, 58:4-12.)

the testimony here.  First, Defendant offered evidence of only a handful of instances of confusion, despite the more than 40,000 sales calls made by both companies over the nine years that the two marks coexisted and the two companies conducted business in the same region.  (Tr., Feb. 2, 2009, 82:3-12, 95:6-96:5; Tr., Feb 5, 2009, 56:11-23, 63:22-64:13, 71:5-19, 77:18-24; 186:24-188:14.)[9]  Second, each instance of confusion was momentary and fleeting.  For example, one witness testified about encountering a PrimePay sales representative after meeting with Primepoint representatives.  She described her confusion:

> She said she is from PrimePay.  I said oh, right.  I met with your two gentleman (sic) last week. . . . And she said from my company?  I said yeah, they are from your company. . . .  I said I can I can prove to you that they are from your company.  I went and got the company['s promotional materials].  She said that is not us.  I said what is the difference?  Yours is the same as theirs. She said no.  We are two different companies.  And she explained to me that they were two separate companies. . . . I was confused . . . because she had a brochure, and the other gentleman had given me a brochure, both of them looked similar.  That was the first thing I saw because she was sitting and I was standing and I looked directly down at her lap, and that is what confused me.

(Tr., Feb. 20, 2009, 55:1-22).  Here, as in the other instances described at trial, the confusion was momentary.  A prospective client quickly glanced at a brochure that was sitting in someone else's lap, and, thinking back on her contact with another

---

[9] Tellingly, Primepoint representatives testified that they are not aware of <u>any</u> instances of anyone being confused between Plaintiff and Defendant.  (Tr., Feb. 2, 2009, 100:10-12; Tr., Feb. 3, 2009, 83:8-11, 117:15-22.)

payroll company with a similar name, she understandably conflated
the two.  Her mistake was quickly and easily corrected.
Importantly, had her mistake not been corrected immediately, she
almost certainly would have clarified the matter on her own, once
given the opportunity to review the second company's promotional
materials.[10]  Despite the evidence of momentary and fleeting
confusion, Defendant offered no evidence that a customer actually
purchased -- or even seriously considered purchasing --
Plaintiff's services on the mistaken belief that Plaintiff was
actually Defendant.

          e. As to the length of time Plaintiff used the mark
without evidence of actual confusion arising: the earliest
evidence of actual confusion in the record is in late 2005.
Thus, the record is devoid of evidence of confusion for the first
five years of Plaintiff's use of the Primepoint mark, despite
Plaintiff's active self-promotion during that period.  (Tr., Feb.
2, 2009, 95:18-25.)  This fact provides further support for the
Court's finding that the instances of confusion were isolated and
sporadic.

_____

          [10] This is confirmed by the testimony of PrimePay employee
James Russell, who testified to an instance of confusion by a
PrimePay client, Tippy Toes Daycare, which came to his attention
only because the client called Russell after receiving a
solicitation from Primepoint to clarify that the two companies
were not affiliated.  (Tr., Feb. 5, 2009, 28:4-10.)  Here, too,
the confusion proved to be momentary, fleeting, and easily
clarified -- in this instance, illustratively, the clarification
occurred on the customer's initiative.

f. Accordingly, the fourth and sixth <u>Lapp</u> factors --
addressing evidence of actual confusion -- weigh in favor of a
finding that confusion more significant than the previously
discussed de minimus examples is not likely.

10. The seventh, eighth, and ninth <u>Lapp</u> factors, which the
Court will address together, weigh in favor of Defendant.  Those
closely related factors are: whether the goods are marketed
through the same channels of trade and advertised through the
same media; the extent to which the targets of the parties' sales
efforts are the same; and the relationship of the goods in the
minds of consumers because of the similarity of function.  All
three factors deal with the nature of the services provided, the
customers targeted, and the methods used to reach those
customers.

a. The parties dispute whether the advertising and
marketing efforts, sales efforts, and functions of Plaintiff and
Defendant are similar.  If the products are closely related and
the parties' sales and marketing efforts overlap, these factors
will weigh in favor of Defendant.  See <u>Checkpoint</u>, 269 F.3d at
288-89 ("[T]he greater the similarity in advertising and
marketing campaigns, the greater the likelihood of confusion."
(quotation omitted)); <u>Urban Outfitters</u>, 511 F. Supp. 2d 504
("When the parties target their sales efforts to the same group
of consumers, there is a greater likelihood of actual confusion

between two marks."). This is a "fact intensive inquiry that requires a court to examine the media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers." Kos Pharms., Inc., 369 F.3d at 722 (internal quotations omitted). In considering whether one company's customers are likely to encounter the other's goods, the Court is mindful that "[g]oods need not be identical for this factor to support a likelihood of confusion." Kos Pharm., 369 F.3d at 723. "The test is whether the goods are similar enough that a customer would assume they were offered by the same source." Checkpoint, 269 F.3d at 286.

b. In this Court's summary judgment Opinion, it held that although there may not be perfect overlap, as both companies offer payroll services and reach many of the same customers, this factor weighs in Defendant's favor. See A&H V, 237 F.3d at 225 (stating that with regard to channels of trade perfect parallelism will rarely be found).

c. At trial, Plaintiff repeatedly sought to support its claim that it does not market to the same sort of customer as does Defendant. Specifically, Plaintiff has argued that it only provides the backend technology for its services to financial institutions; those institutions -- so called "co-branders" -- in turn, sell the services under their own names to small-business

32

clients.  (Tr., Feb. 3, 2009, 101:14-18, 121:7-16.)  In contrast,
Defendant markets its services directly to the small-business
clients under its own name.  (Tr., Feb. 6, 2009, 5:23-6:2; Tr.,
Feb. 5, 2009, 77:18-24.)  The Court finds this distinction
unpersuasive, however.  A substantial portion of Primepoint's
business is conducted through an entity called Delaware Valley
Payroll.  (Tr., Feb. 2, 2009, 98:13-16.)  That entity shares
common ownership, a common office, and common employees with
Primepoint.  (Tr., Feb. 3, 2009, 88:13-20, 98:7-99:20, 130:3-13.)
The services supposedly offered by Delaware Valley Payroll to
small-business customers are promoted under the Primepoint brand
and mark.  (Tr., Feb. 2, 2009, 51:16-18, 125:12-127:18,
130:14-133:14, 134:18-135:4; 135:11-136:8, 138:14-24; Tr., Feb.
20, 2009, 138:15-24.)  The record is replete with evidence that
Delaware Valley Payroll and Primepoint, while distinct corporate
entities, actually operate as a single business.  (Tr., Feb. 3,
2009, 143:7-21; Ex. D-35; Ex. D-29.)  Importantly, even when
Plaintiff is soliciting business on behalf of genuinely
independent financial institutions, the Primepoint mark is
prominently displayed and continues to be presented to the
customer in the delivery of services.  (Tr., Feb. 2, 2009,
56:7-10, 59:25-60:3, 64:11-15, 66:6-10, 78:18-25, 82:19-24,
94:21-95:2,101:22-102:6, 130:14-133:14; Ex. D-11 (at
00022-00025)).  Thus, although a portion of Plaintiff's business

is conducted through "co-branders", there is substantial direct competition between Plaintiff and Defendant to perform the same services for the same clientele.  In the mind of a prospective customer, the subtle distinction between the respective business models of Plaintiff and Defendant are irrelevant.  Accordingly, the seventh, eighth, and ninth Lapp factors, addressing the overlap of the services provided, the customers targeted, and the methods used to reach customers, weigh in favor of Defendant.

11. The tenth Lapp factor is whether the parties are likely to expand into one another's market space.  Defendant urges the Court to consider that Plaintiff is a small but growing company, which is likely to increase the number of services it provides, as well as its geographic reach.  (Tr., Feb. 3, 2009, 140:8-21.) Notably, the record evidence indicates that Plaintiff has grown in the past, but has no plans to continue expanding.  (Tr., Feb. 2, 2009, 85:12-86:1, 123:7-10; Ex. D-40 (at 00034).)  In any event, the parties have not argued why these facts bear upon the likelihood of consumer confusion, nor why they add to the already-discussed factors.  Accordingly, the Court will not weigh this tenth Lapp factor in its final determination.

12. Taking all of the Lapp factors into consideration, this Court finds that there is not a likelihood of confusion between the marks of Plaintiff and Defendant.  The Court has found that most of the Lapp factors weigh in favor of Plaintiff:  the

PrimePay mark is weak; the relevant customer decision requires
sophistication, heightened care, and attention; the Plaintiff
lacked a purposeful or reckless intent when adopting the mark;
and the only evidence of actual confusion was isolated,
momentary, and fleeting, further illustrated by the five years
Plaintiff used its mark before any confusion arose.  Although the
seventh, eighth, and ninth factors -- addressing the overlap of
the services provided, the customers targeted, and the methods
used to reach customers -- weigh in favor of Defendant, this is
insufficient to find a likelihood of confusion.  Finally, given
the notable similarities and differences between Primepoint and
PrimePay marks, the Court finds that this factor weighs neither
clearly for, nor clearly against, an ultimate determination of a
likelihood of confusion.  Accordingly, the Court finds that,
taking the ten <u>Lapp</u> factors together, there is not a likelihood
of customer confusion.

## **Conclusion**

For the factual reasons stated above and the legal
conclusions drawn therefrom, the Court finds that Plaintiff has
not infringed upon Defendant's trademark.  Accordingly, judgment
will be entered in favor of Plaintiff's claims that no
infringement under the Lanham Act occurred and that it did not
falsely designate the origins of its products and services, nor
engage in unfair competition; and judgment will be entered

against Defendant's counterclaims.


Dated: **June 30, 2009**          **s/Renée Marie Bumb**
                                  RENÉE MARIE BUMB
                                  UNITED STATES DISTRICT JUDGE